[Civ. No. 37932. Second Dist., Div. Five. Nov. 16, 1971.]

JOYCE E. ASCOUGH, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD,
HUGGINS YOUNG COFFEE COMPANY et al., Respondents.

COUNSEL

Hall, Moore & Norkin and Joseph E. Hall for Petitioner.

Rupert A. Pedrin, Stanley S. Feinstein, T. Groezinger, Loton Wells and Philip M. Miyamoto for Respondents.

OPINION

**AISO, J.**—Petitioner Joyce E. Ascough also known as Joyce E. Federow seeks review and annulment of the opinion and decision after reconsideration of the Workmen's Compensation Appeals Board (Board) which reduced her permanent disability to 46½ percent from the 100 percent found by the referee.

Petitioner, then a 27-year old secretary,[1] tipped over backwards in her swivel chair while at work on March 27, 1963, striking the floor forcefully and suffering a cerebral concussion, sprains to her spine in the cervical, thoracic, and lumbar areas, together with subsequent headaches, vertigo,[1] and faintings (some of which were found by various doctors to be subjective complaints not discoverable nor verified by objective findings).[2] Temporary disability for the maximum of 240 weeks and costs of medical treatment, including a disectomy and fusion of the cervical spine, were awarded and paid.

On December 11, 1969, the referee issued findings and award for 100 percent permanent disability (including a life pension) and further medical treatment.[3] Defendants (employer and insurance carrier) petitioned for a rehearing contending that applicant was not 100 percent disabled and re-

---

[1] On March 29, 1966, it was stipulated that she was born April 2, 1935, and that her name be corrected to show it to be Joyce E. Federow. She remarried in December 1965.

[2] Petitioner was involved in two rear-end automobile accidents in November 1963 and May 1964. Dr. Julius Yale Sher reported on July 24, 1965, that these accidents temporarily aggravated her condition and Dr. Wilson Mizener who examined her on September 24, 1965, reported that there were no residuals from these accidents. Dr. H. A. Thomason of the Medical Bureau also seemed to agree. Petitioner went through divorce proceedings instituted in July 1964 "which were finalized in July of 1965."

[3] These findings and award are not in the record or the pleadings, but since petitioner's allegation to this effect (Pet. 4) is acknowledged in the Board's answer to the petition (Ans. 10), we assume this to be true. We find in the record a recommended rating (dated October 15, 1969) for "100% amounting to 400 weeks of disability payments . . . in the total sum of $21,000.00, and thereafter a life pension . . . of $48.46 per week."

questing an examination by the Medical Bureau. In granting the reconsideration, the Board stated, in relevant part: "It is asserted the evidence does not support this finding [100 percent]. [¶] After review of the record, the Board is of the opinion that reconsideration should be granted for examination of applicant and report by the Medical Bureau . . . [and] for such further proceedings as may thereafter be indicated in the record. . . ." Petitioner sought review of this order by alleging that it did not comply with the requirements of Labor Code section 5908.5,[4] but review was denied by this court and the Supreme Court on the ground that it was not a reviewable order (not final).

Following grant of reconsideration, Dr. H. A. Thomason of the Medical Bureau examined petitioner on March 5, 1970, and filed his report which was received into evidence on July 14, 1970. The Board prepared new instructions to the rating bureau on which the rating expert (D. S. Lucien) recommended a rating of 47 percent. A supplemental hearing was held on October 27, 1970, before a referee pursuant to a notice stating it to be for the cross-examination of Dr. Thomason and of rating expert Lucien and rebuttal at applicant's request. Dr. Thomason was examined. Mr. Lucien was likewise examined at which time he reduced his recommended rating to 46½ percent[5] when it was agreed that the correct age of petitioner at the time of accident was 27 and not 29 as shown on the instructions to him. Petitioner also filed a report of Dr. Richard Scandalis, an orthopedic surgeon, who examined petitioner on August 11, 1970. Several motions and a cross-motion were made. The referee ordered the parties to address these motions in writing directly to the Board.

Petitioner's motions were: (1) to have petitioner examined by (a) an ophthalmologist and (b) an otologist; (2) to file the report of Dr. J. Dewitt Fox, a neurologist, which would be ready within a few days, and a report by a psychiatrist with whom petitioner had an appointment for examination on November 2, 1970; and (3) to strike the recommended permanent disability rating on grounds that it failed to consider even the factors which Dr. Thomason had specified. Defendants moved to strike the recommended rating on the ground that the rater had not considered the results of the two rear-end automobile accidents in which petitioner had been involved.

---

[4]All references to code sections refer to the Labor Code unless otherwise noted. Section 5908.5, in relevant part, provides: "Any decision of the appeals board granting or denying a petition for reconsideration or affirming, rescinding, altering, or amending the original findings, order, decision, or award . . . shall state the evidence relied upon and specify in detail the reasons for the decision. . . ."

[5]A rating of 70 percent or over is required for a life-time pension. (§ 4659, subd. (b).)

The Board on December 14, 1970, handed down its opinion and decision after reconsideration, without ruling on the motions and cross-motion. It accepted the recommended rating of 46½ percent. It denied expense of $450 stating: "It is noted that applicant's counsel has submitted additional medical evidence and a statement in the sum of $450.00. No provision was made for the submission of additional medical evidence, nor are we convinced that such expense is reasonably incurred in this case at this time. Therefore, the additional medical reports are not being admitted into evidence at this time." Petitioner's petition for reconsideration was denied by the Board on January 12, 1971.

### Petitioner's Contentions

The thrust of petitioner's arguments appears to be the same as that raised in her petition for reconsideration, namely: (1) the Board violated the requirements of section 5908.5 in granting reconsideration; (2) the Board acted arbitrarily in denying petitioner an opportunity to rebut the evidence presented or to file reports on issues newly raised in the supplementary hearing of October 27, 1970; (3) the Board's findings are not supported by substantial evidence on the basis of the entire record, especially with reference to matters pertaining to the recommended rating by rating expert Lucien.

We have concluded that prejudicial errors, which we shall point out below, require the opinion and decision of the Board to be annulled and the case remanded to the Board.

Only those portions which appear essential to a consideration of petitioner's contentions and respondents' answer will be set forth. However, in this area we shall try to set it forth in considerable detail.

The evidence adduced on the permanent disability rating hearing before the referee on July 11, 1969, consisted of: (1) medical reports: (a) by Dr. Robert A. Roback, an orthopedic surgeon, dated November 20, 1968, (b) by Dr. William G. Rhorer, dated May 21, 1969, reporting his orthopedic examination and evaluation, and his supplemental report, dated July 9, 1969, after seeing the film mentioned below, and (c) various reports of Dr. Francis J. Williams who had performed "a C4-5 laminectomy and a C4-6 fusion" on petitioner; (2) a film (150 feet long) taken of petitioner in January 1969; and (3) the testimony of petitioner and of Ted Mroczek, who laid the foundation for the film's admission into evidence.

Dr. Roback's diagnosis was: "1. Derangement of the cervical spine, associated with injury to intervertebral discs, associated with surgical excision of the discs between the 4th and 5th, and the 5th and 6th cervical vertebrae,

and associated with a stable fusion of the 4th, 5th and 6th vertebral bodies. 2. Derangement of the low back, associated with injury to one or more lower lumbar intervertebral discs. 3. Cephalalgia [pain in head], probably associated with a post concussion like syndrome, and probably also, in part, of cervical origin." In his prognosis, he stated in part: "The subjective complaints and the objective findings appear to be a result of that [March 1963] injury. The patient's present condition is essentially stationary, however, the patient will probably require treatment from time to time for the rest of her life. The type of treatment will depend upon the intensity of pain and associated disability. [¶] The patient may be rated for permanent disability at this time. . . . [¶] The subjective factor of pain would rate as moderate, at times becoming severe, in her regular employment. [¶] The patient is considered incapable of competing in the open labor market for employment."[6]

Dr. Rhorer in his comment stated in part as follows: "The factors of disability pertain both to the neck and the low back." He agreed that the condition of the neck and back area was stationary and permanent for rating purposes. He concurred in the opinion of the operating surgeon that petitioner would occasionally require treatment of her neck and low back, and further stated that she was not a candidate for surgery to her lower back at the time of his examination. The disability consisted of limited motion and "subjective complaint of a variable pain in the neck which extends into the back of the head and sometimes into both arms, but more markedly on the right, with the neck pain aggravated by positioning of the head, particularly in extension and by active use of the neck, with the pain reasonable [*sic*] ranging from absent to the mid-range of slight. Although there are not objective physical findings of weakness and easy fatiguability in the right upper extremity, one may reasonably accept such a complaint in view of the history and findings in the range of slight. The patient, by reason of the injury to the neck and the present status of it, as a consequence of [,] the patient should not plan to engage in occupations in which use of her neck in an extended position more than momentarily is required. She has discomfort also with maximum flexion, but moderate flexion such as is required in secretarial work is well within her capacity. As the evaluation of the magnitude of the pain above indicates, she would engage in that occupation with some handicap because of the level of discomfort attendant upon it. [¶] The low back problem appears distinctly less bothersome than the neck. Low

[6]Under Board rules, a "severe" pain precludes the activity precipitating the pain; a "moderate" pain could be tolerated, but would cause marked handicap; a "slight" pain could be tolerated, but would cause some handicap; a "minimal" pain would be only an annoyance and nonratable. (Rule 9727, Rules of Administrative Director; see Cal. Admin. Code, tit. 8, § 9727.)

back pain variable from absent to the mid-range of slight, with long sitting or with active use of the back may be reasonably accepted as a permanent disability factor from the above described injury. I find . . . no other disability factors with respect to the low back. I would think it unwise for this woman to engage in work which would require her to exert more than twenty-five pounds lifting with any given lifting effort, but I would regard that she should not so engage, even if she had not had injury to her back on 27 March 1963. [¶] The combined effects of the cervical and low back injuries do produce some handicap for this woman in working as a secretary, or in carrying out other possible occupations for which she might be otherwise eligible. Nevertheless, the findings are such that performance in such a capacity as a secretary is well within her physical capabilities."

After viewing the film, he reported: "On July 7, 1969 I viewed some movies of Mrs. Federow and a review of these films re-enforced my belief that the patient is able to function as a secretary. I have the impression after reviewing my records and seeing the movies that the patient can do so without material handicap." Dr. Roback did not see the film. Dr. Williams refused to look at it.

Dr. Williams' letters to the respondent carrier are reports of follow-up examinations of the petitioner. He reported on April 16, 1968, examination of petitioner "shows limitation of neck motion with rotation being limited to about 75 degrees of normal. Neck flexion and extension limited to about 50 percent of normal. She continues to have the residual hypalgesia [diminished sensitiveness to pain] C6 and C8 distribution in both upper extermities. The right ankle reflex is still absent. [Her] residuals appear to be permanent and stationary with limitation of neck motion. This produces neck pain and headaches. She has limitation of her activities with her low back problem with limitation of bending and lifting. There are no signs of intracranial problems. [She] is able to carry on in her housework adjusting to the limitations. [She] does not require daily medication, only requiring an occasional Miltown, a muscle relaxant, and an occasional Empirin #3 for analgesia."

His examination of petitioner on December 12, 1968, indicated that her symptoms had apparently increased with her pregnancy, that "[s]he apparently has daily symptoms both in the cervical and low back areas. The cervical symptoms radiate into the right upper extremity to the dorsum of the hand particularly to the center fingers and the thumb. . . . She has some low back pains radiating into the right leg, lateral thigh and calf to the top of the foot, then to the great toe. The left leg has some pain in the posterior thigh and the anterior part of the leg. . . . With posterior cervical pain she also has occipital [pertaining to the back part of head] headaches. Examination shows neck tilting, posteriorly, to be somewhat limited

and to reproduce the cervical pain. There may be some tightness of the posterior cervical muscles. The right biceps reflex is diminished compared to the left. There is hypalgesia on the left in the C6 root distribution and on the right in the C7-8 distribution. . . . There appears to be hypalgesia on the right on the lateral and medial aspect of the foot, lateral aspect of the calf; and on the left on the lateral aspect of the foot. There also appears to be some hypalgesia in the meralgia paresthetica[7] area on the left, a residual of the surgery at the donor site of the previous cervical fusion."

The referee's summary concerning the film was: "Motion pictures were shown consisting of 100 feet taken on January 7, 1969, and 50 feet on January 8, 1969 . . . the applicant could be discerned walking and on one occasion, walking at a very fast trot or a slow run. Some of the pictures showed her carrying an infant on her left arm, and at times, in the infant carrier in both arms. It showed her standing on the ground bending into the interior of an automobile placing something in place."

Petitioner testified: At the time the movies were taken she was carrying her daughter then about 3 months old (born September 24, 1968), weighing 10 to 11 pounds. When she ran in the pictures, it must have been because the baby cried. She was carrying a little bag with baby prescriptions and at one time she believes she was carrying a bag that contained a blouse. The distance from her front door to the car is 20 feet. Her husband or sister usually carry the baby, but her husband was away at the time. At the time, she was taking Empirin No. 3 or aspirin as pain pills and also sleeping pills "at times" for her back. She drove her son three or four miles to school in the morning and picked him up at 3 p.m. The car had automatic transmission and power steering. While she does not "wear out" in the morning, she feels the effect of her activities in the afternoon.

She did not believe she could work as a secretary. Her right hand was better after surgery, but she cannot write with it for any length of time, especially in shorthand. She is unable to use that hand for typing, because she has to sit with her shoulders forward, which then causes her head and neck to bother her. After sitting 10 minutes, she has to move around because of the low back pain. If she sits too long, her legs go "dead." This is only temporary; the right leg is the worse. When she squats she has to bend her knees.

---

[7]Definitions added are from Dorland's Illustrated Medical Dictionary (23d ed.). Meralgia paraesthetica: "A disease marked by paresthesia and disturbance of sensation in the outer surface of the thigh, in the region supplied by the external cutaneous femoral nerve. The paresthesia consists of burning, tingling, stabbing pains of considerable severity, or possibly only of a feeling of numbness. . . ."

She does not do any house-cleaning; she just feeds her children, cooks dinner, and puts the dishes in a dishwasher. When not otherwise occupied, she rests with her feet up so as to relieve the pressure on her back. She spends eight of her waking hours thusly. She can stand still for two minutes and walk around for ten minutes, but then her back "hurts worse." In the words of the referee's summary: "She has a constant bothersome feeling in her neck which goes into her right arm and into the left shoulder." The pain in her neck is always present. It is sharper than the one in the low back which is a dull ache. The neck pain runs up the back of the head to its crown. If her head is moved suddenly or if she jerks her neck while sleeping, a violent headache results. It will subside in about four hours with the taking of one Empirin. The next day, it will go down. The use of her right arm causes difficulty. She does not wear glasses, but notices blurring of vision from time to time accompanying her headaches. All of these complaints have been the same for about 60 days.

The referee reserved the matter of having petitioner examined by the Medical Bureau for later exercise of her own discretion. She apparently did not order it.

Following the grant of reconsideration, Dr. Thomason examined petitioner on March 5, 1970. Her complaints to Dr. Thomason were essentially the same as her testimony given before the referee, recited above. She additionally complained that "she occasionally feels like air is going into the right ear, and there is some loss of hearing of this ear. This condition lasts for less than one half a minute."

Dr. Thomason found the pupils of petitioner's eyes to be equal and to react normally to light and accommodation, without nystagmus (involuntary rolling of eyes). Among other things, he found hypesthesia (impairment or lessening of tactile sensibility) in the thigh, leg, foot and toe areas of petitioner's legs. The right patella and Achilles reflexes were diminished. In his discussion and opinion section of his report, he enumerated the disability factors as consisting of: (1) loss of neck motion, (2) grip loss (right) due to neck condition, and (3) subjective complaints considered slight for the head complaints and slight for the neck and back complaints becoming moderate when these pains are sharp. He stated: "Pertaining to work this applicant should be restricted to semisedentary work *because of the spine alone.*" (Italics added.) Provision for back surgery should be made so that she can have surgery when it becomes necessary as she probably has a herniation of a lumbar disc.

· At his court examination on October 27, 1970, Dr. Thomason stated: His training has been in surgery and orthopedics; otherwise he has no specialty. Concerning petitioner's complaints of aural and visual difficulties, these

could best be appraised by an otologist and ophthalmologist, respectively. He did not try to pass any professional judgment on these complaints. He did not perform a neurological examination of the head as that is out of his field. On these areas outside of his field, he could only rely upon petitioner's complaints.

Petitioner's counsel inquired, "what area of the body do you consider to be the spine?" He answered: "When you say the spine, of course, I was asked for examination of the back. I think that should have been examination of the spine because the back doesn't include the neck, but when you say spine, the spine includes everything from the occiput [back of the head] where the first cervical vertebra attaches to the skull down to the end of the coccyx." It does not include the head. Counsel for defendant carrier inquired in his examination whether Dr. Thomason's examination of areas not involving orthopedics was in order to accomplish a complete examination. After stating that for areas outside of his field he had just taken the complaints of petitioner, he said that he had read the whole file and saw that "it involved more than just the back, and so I took it upon myself to go ahead and take that into consideration; in other words, I think this should have been examination of the spine and not the back."

Petitioner's complaint of numbness in the right upper extremity is due to her neck condition involving the "brachial plexus which comes from the cervical plexus." He would not classify petitioner's pain as severe, since such pain totally precludes activity causing it. (See fn. 6, *supra*.)

He did not review any X-rays in making his report, and he did not order the taking of any. He did not think that the two rear-end automobile accidents caused more than temporary aggravation. He did not have Dr. Scandalis's report dated August 14, 1970, when he wrote his report, but he noted that the report indicates that Dr. Scandalis thinks petitioner has "an anxiety neurosis."

After he was shown the January 1969 film of petitioner in court, he stated that a view of the film did not cause him to change any of his opinions. He did not place much significance on just one running or trotting episode. The baby was small.

He used the term "semisedentary" to describe a person's work in a sitting position for a total accumulated time of four hours (not continuously or at one sitting) out of eight. He believed petitioner could compete in the open labor market, because he saw no reason why she could not continue being a secretary.

The Board instructed the rating expert: "Neck injury resulting in loss of neck motion and grip loss as recorded in report of Dr. H. A. Thomason

dated March 6, 1970. [¶] Constant slight pain in neck and head becoming moderate upon any motion of neck and upon lifting, bending, and coughing. [¶] *Back disability* limiting applicant to semi-sedentary work." (Italics added.)

The rating expert Lucien was examined also on October 27, 1970. In reply to questions from counsel for both sides and the referee, he stated: He used a 60 percent rating to the back disability limiting applicant to semisedentary work, which, adjusted for occupation and age, came to 47 percent (later adjusted upon correction of age to 46½ percent). He did not give anything for grip loss or for anxiety neurosis. He considered only the factors set forth in the instructions. He interpreted the complaints to be in the cervical spine and in the head. He assumed the "back disability limiting applicant to semisedentary work was related to the neck and the head." He would have reached the same rating had the given factor been solely "back disability limiting applicant to semisedentary work." "I considered the neck and head complaints to be contiguous and I felt that they were upon the same activities or lack of activities, . . .; so therefore I considered this as one, basically one separate area which would have given, basically, perhaps a 55 per cent standard. Since the greatest disability was the back disability or the overall condition which limited the applicant to the work plateau of semisedentary work, I felt this was the greater disability, and so I rated upon that." The head, neck, and back disabilities do have separate places in the rating manual, except when "properly encompassed in a preclusion which is greater than the individual part."

The referee noted for the attention of the Board that Dr. Thomason's testimony indicated that the Board's use of "back" in its request to him ignored the neck and head and caused some confusion, which might have also confused the rating expert Lucien.

### Discussion

■ We now consider petitioner's contentions, the validity of which we believe to be dispositive of this review, bearing in mind that workmen's compensation laws are to be "liberally construed 'with the purpose of extending their benefits for the protection of persons injured in the course of their employment.'" (§ 3202; and, e.g., *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 801 [69 Cal.Rptr. 88, 441 P.2d 928]; *Jones* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 476, 480 [67 Cal.Rptr. 544, 439 P.2d 648].)

Petitioner's contention that the Board in granting its reconsideration upon defendants' (employer's and carrier's) petition violated the provisions of section 5908.5 (see fn. 4, *supra*) appears to be well taken. ■ Although

the Board has considerable discretion in determining whether reconsideration should be granted *(Redner v. Workmen's Comp. Appeals Bd.* (1971) 5 Cal.3d 83, 92-93 [95 Cal.Rptr. 447, 485 P.2d 799]), it is also required in granting a petition for rehearing to "state the evidence relied upon and specify in detail the reasons for the decision" so as to apprise the parties and the referee as to the basis for reconsideration. *(LeVesque v. Workmen's Comp. App. Bd.* (1970) 1 Cal.3d 627, 635, fn. 11 [83 Cal.Rptr. 208, 463 P.2d 432].) Defendants' petition was based upon a claim that the evidence did not support the referee's finding of 100 percent permanent disability and that petitioner should be examined by the Medical Bureau. Petitioner contended that the referee's finding was supported by substantial evidence. ▬ We do not think the Board's statement, "After review of the record, the Board is of the opinion that reconsideration should be granted for examination of applicant and report by the Medical Bureau . . . , for such further proceedings as may thereafter be indicated in the record . . ." met the requirements of section 5908.5. It certainly did not delimit what the proceedings after Dr. Thomason's report would be. This was a factor leading to the dispute at the close of the supplemental hearing on October 27, 1970: whether the "rebuttal" to the testimony of Dr. Thomason and of the rating expert Lucien was to be narrowly limited, or whether petitioner would be able to introduce additional reports on issues which arose out of that hearing and upon which there was no substantial medical evidence, e.g., visual and auditory symptoms and anxiety neurosis. (Cf. *Hegglin v. Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 162, 175 [93 Cal.Rptr. 15, 480 P.2d 967].) The record does leave room for doubt as to whether, under the foregoing circumstances, the Board's decision upon reconsideration was reasonable or unreasonable (§ 5952, subd. (c)). The term "unreasonable" has been construed to include unfair and arbitrary procedure. *(Redner v. Workmen's Comp. Appeals Bd., supra,* 5 Cal.3d 83, 93, fn. 11.) Upon remand the Board should reconsider this problem and make a determination in the exercise of its discretion and, of course, adequately express its reasoning.

There was also confusion in the rating procedure. Dr. Thomason stated that the Board should have asked him to make a spinal examination instead of an examination of the "back." He explained that his use of the word spine includes everything from the occiput to the coccyx. The Board, however, apparently understood the words "spine alone" to mean "the back" and used the phrase "back disability limiting applicant to semisedentary work." The rating expert stated that he would have given the same rating even if this last phrase had stood alone. He did not give anything for grip loss and considered complaints of the cervical spine and in the head to be a part of the back disability. The referee alerted the Board

to this confusion in the record of the October 27, 1970, hearing. The rater admitted that there would be separate ratings as to the neck, head, and back if they were not all part of one interconnected overlapping disability.

█ It was incumbent upon the Board to describe the disability in full on the face of the request for permanent rating. (*Hegglin* v. *Workmen's Comp. App. Bd., supra,* 4 Cal.3d 162, 172; see Cal. Admin. Code, tit. 8, § 10904.)

█ If all of the individual physical and mental abnormalities resulting from the injury are not listed as factors, the resulting rating is not a proper one. (*Hegglin* v. *Workmen's Comp. App. Bd., supra,* at pp. 171-172.)

█ Any overlap of the multiple factors of disability caused by a single industrial accident is adequately taken into account and the pyramiding of disabilities is properly avoided by application of the multiple disabilities rating schedule. (*Hegglin* v. *Workmen's Comp. App. Bd., supra,* at p. 174; see Cal. Workmen's Compensation Practice (Cont. Ed. Bar 1963) § 17.19, pp. 548-550.)

Since a remand of the case is required, it is unnecessary to discuss the other matters of which petitioner complains.

### Disposition

█ The opinion and decision after reconsideration granted and made under date of December 14, 1970, is annulled and the case remanded to the Workmen's Compensation Appeals Board with directions to take such further proceedings, in accordance with this opinion, as may be necessary.

Stephens, Acting P. J., and Reppy, J., concurred.