[Civ. No. 26853. Fourth Dist., Div. One. Apr. 16, 1985.]

In re the Marriage of JOYCE AND VICTOR GRINIUS.
JOYCE GRINIUS, Appellant, v.
VICTOR GRINIUS, Respondent.

## COUNSEL

James E. Sutherland and Gerald Dawson for Appellant.

Lightner & Castro and Christopher J. Schatz for Respondent.

## OPINION

**WORK, J.**—Joyce M. Grinius appeals an interlocutory judgment of dissolution awarding restaurant real property to her husband Victor as his separate property and denying her claim for attorney's fees. Joyce contends there is insubstantial evidence to rebut the presumption property acquired during marriage has a community nature. (Civ. Code,[1] § 5110.) Joyce contends: (1) notwithstanding the antenuptual agreement, the restaurant real property was acquired after marriage and should be a community asset; (2) the purchase money loans were acquired or obtained with a view toward community assets and contributions and therefore are community property; and (3) the presumption arising from the title to the restaurant property is not conclusive and, on these facts, does not rebut a presumptive finding of community property. We hold the restaurant real property is community property, reversing that part of the judgment effecting the property division, with directions to determine whether Victor should be reimbursed under section 4800.2 for his separate property contributions. We also find the trial court did not abuse its discretion in denying Joyce's request for attorney's fees and affirm this part of the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Victor and Joyce Grinius were married the same day they signed an antenuptual agreement[2] which listed their separate assets and stated "all property owned by [either spouse] at the time of the marriage and all property coming to [either spouse] from whatever source during the effective term

---

[1]All statutory references are to the Civil Code unless otherwise specified.

[2]Neither party contests the legality of the antenuptual agreement. Victor authorized the drafting of the agreement and proffered it to Joyce shortly before their marriage. Joyce was advised by independent counsel before signing the agreement.

of this Agreement shall be the separate property of [the respective spouse.]" Victor listed common stock in two companies, $2,500 in a profit sharing plan, improved San Diego real property, and unimproved real properties in Florida. Joyce listed only her car and miscellaneous household furnishings.

The antenuptial agreement also provided: "This Agreement shall be binding upon the parties during the first six years of marriage only. Thereafter, the terms of this Agreement may be renegotiated by the mutual agreement of both parties or, in the alternative, the parties may choose not to renegotiate its terms and to allow it to entirely lapse. In such latter event, each party shall immediately have, upon expiration of said first six years of marriage, all rights and obligations with respect to each other and with respect to property which are provided by law. Such rights and obligations shall be retroactive to the date of marriage without regard to the provisions otherwise contained in this paragraph." However, even after a lapse, the parties' premarital separate property was to retain its separate character.

Shortly after marriage Victor resigned his job so he and Joyce could open a restaurant. Joyce apparently had worked in a restaurant for a number of years before marriage. They located a suitable building, costing $60,000. The purchase money was obtained from two sources: (1) a $20,000 downpayment from an $80,000 Small Business Administration (SBA) loan guaranty lent by California First Bank (hereafter referred to as SBA loan) and (2) $40,000 loaned by Home Federal Savings and Loan. Although only Victor signed the SBA loan guaranty, both Victor and Joyce signed the promissory note from California First Bank. Victor alone signed the Home Federal Savings and Loan promissory note. The SBA loan was secured by both community and separate property. Both Victor and Joyce negotiated the original purchase offer. However, without Joyce's knowledge, Victor placed title to the property in his name alone.

Victor and Joyce used the remaining $60,000 of the SBA loan to remodel the building, buy equipment, and pay their living and restaurant expenses. These funds were disbursed through the restaurant's checking account on which Victor and Joyce were the signators. Indeed, during the course of the marriage all personal and restaurant expenses were paid from this joint account.

Victor and Joyce both worked in the restaurant in several different capacities and continued to do so during the course of their marriage. Their community earnings were placed in the restaurant checking account; however, from time to time Victor also deposited funds received from his separate property into the account to prevent overdrafts.

Monthly payments on the purchase money loans were made from the joint restaurant checking account. In 1975 Victor also used $30,098.00 and $39,821.93 of his separate property funds to pay on the SBA and Home Federal loans, respectively. Again, in 1978 Victor paid $33,818 of separate property funds to retire the SBA loan. That same year, Victor and Joyce signed a $63,000 installment note in favor of San Diego Trust and Savings, secured by a trust deed on the restaurant property. From these proceeds, $42,000 was used to pay the outstanding balance on the Home Federal promissory note.

Victor and Joyce separated in April of 1980. Before trial, Victor stipulated the restaurant business was community property and the business was sold. Victor and Joyce and their respective counsels were each granted $5,000 from the sale proceeds. The trial court found all of the contested assets, except the restaurant real property, to be community property. The restaurant real property, worth $340,000, was determined to be Victor's separate property.

### THE SEPARATE PROPERTY CHARACTERIZATION OF THE RESTAURANT REAL PROPERTY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

### I

A trial court's findings regarding a property's separate or community character is binding and conclusive on review when supported by substantial evidence (*Beam* v. *Bank of America* (1971) 6 Cal.3d 12, 25 [98 Cal.Rptr. 357, 490 P.2d 257]; *Hicks* v. *Hicks* (1962) 211 Cal.App.2d 144, 149 [27 Cal.Rptr. 307]), even though evidence conflicts or supports contrary inferences. (*Beam* v. *Bank of America, supra,* at p. 25; *Mears* v. *Mears* (1960) 180 Cal.App.2d 484, 500-501 [4 Cal.Rptr. 618], disapproved on other grounds in *See* v. *See* (1966) 64 Cal.2d 778, 785-786 [415 P.2d 776].) However, substantial evidence is not synonymous with "any" evidence. (*Hall* v. *Department of Adoptions* (1975) 47 Cal.App.3d 898, 906 [121 Cal.Rptr. 223].) It must have ponderable legal significance and " 'must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' [Citation.]" (*Ibid.*)

We review the evidence supporting the trial court's characterization of the restaurant property as Victor's separate property.

Property bought during marriage by either spouse is rebuttably presumed to be community property (§ 5110; *See* v. *See, supra,* 64 Cal.2d

778, 783; *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 455 [152 Cal.Rptr. 668], disapproved on other grounds in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 815 [166 Cal.Rptr. 853, 614 P.2d 285]), and typically the spouse asserting its separate character must overcome this presumption. Victor relies on the antenuptial agreement to support his separate property claim. ■ Such agreements can control the character of marital property and do prevail when Family Law Act presumptions are to the contrary. (§ 5133; *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 357 [131 Cal.Rptr. 3, 551 P.2d 323]; *Tompkins* v. *Bishop* (1949) 94 Cal.App.2d 546, 549-550 [211 P.2d 14].)

Here, the antenuptial agreement is a comprehensive attempt to maintain the separate property character of assets acquired both before and during marriage, but it is time-limited. It lapsed six years after the date of marriage and reinvested the spouses with all communal rights retroactive to the date of marriage. Therefore, at trial the agreement had no effect on the presumption of community acquisition.

Victor next traces the source of payments for the restaurant property to overcome the fundamental community presumption. Specifically, he argues the purchase money loans were separate property and the restaurant real property, thus acquired, maintains the same character. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 610 [122 Cal.Rptr. 79, 536 P.2d 479].)

■ "The character of property as separate or community is determined at the time of its acquisition. [Citations.]" (*See* v. *See, supra,* 64 Cal.2d 778, 783; accord *Giacomazzi* v. *Rowe* (1952) 109 Cal.App.2d 498, 500-501 [240 P.2d 1020].) Here, the restaurant property was acquired shortly after marriage and is presumed to be community property. (§ 5110.) ■ However, the character of credit acquisitions during marriage is "determined according to the intent of the lender to rely upon the separate property of the purchaser or upon a community asset. [Citations.]" (*In re Marriage of Aufmuth, supra,* 89 Cal.App.3d 446, 455.)

While the California courts have consistently and uncritically applied the intent-of-the-lender rule, they have inconsistently espoused the applicable test. (See generally Young, *Community Property Classification of Credit Acquisitions in California: Law without Logic?* (1981) 17 Cal.Western L.Rev. 173 (hereafter cited as *Classification of Credit Acquisitions*).) In early cases, the Supreme Court required a showing the lender relied *entirely* on the existing separate property of a spouse in extending the loan to characterize the loan proceeds as separate property. (*Estate of Holbert* (1881) 57 Cal. 257, 259; *Estate of Ellis* (1928) 203 Cal. 414, 416 [264 P. 743].) The more modern and oft-cited formulation found in *Gudelj* v. *Gudelj* (1953) 41 Cal.2d 202 [259 P. 656], apparently relaxes the standard: "In

the absence of evidence tending to prove that the seller *primarily* relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the [section 5110] presumption." (*Id.*, at p. 210; italics added.) The *Gudelj* opinion cited no authority for this apparent change and had no opportunity to apply the standard since no evidence of lender reliance on separate property was proffered. Later cases have been decided on seemingly different standards. Courts have found evidence of lender's intent in: (1) reliance on or hypothecation of separate property (*Bank of California* v. *Connolly* (1973) 36 Cal.App.3d 350, 375 [111 Cal.Rptr. 468]; *Ford* v. *Ford* (1969) 276 Cal.App.2d 9, 13-14 [80 Cal.Rptr. 435]; *Somps* v. *Somps* (1967) 250 Cal.App.2d 328, 336-337 [58 Cal.Rptr. 304]; *Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, 153); (2) sole reliance on separate property (*Howard* v. *Howard* (1954) 128 Cal.App.2d 180, 186 [275 P.2d 88]); and (3) extension of the loan on the faith of existing property belonging to the acquiring spouse (*In re Marriage of Aufmuth, supra,* 89 Cal.App.3d 446, 455-456; *In re Marriage of Stoner* (1983) 147 Cal.App.3d 858, 863-864 [195 Cal.Rptr. 351].) Nonetheless, in all of the above cases, loan proceeds were characterized as a spouse's separate property *only* when direct or circumstantial evidence indicated the lender relied solely on separate property in offering the loan.

■ With the above review in mind, we restate the applicable standard: Loan proceeds acquired during marriage are presumptively community property; however, this presumption may be overcome by showing the lender intended to rely solely upon a spouse's separate property and did in fact do so. Without satisfactory evidence of the lender's intent, the general presumption prevails.

■ Victor presented no direct evidence of lender intent and instead offered circumstantial evidence to prove lender reliance on his separate property. (*Estate of Updegraph* (1962) 199 Cal.App.2d 419, 422 [18 Cal.Rptr. 591].) He argues the "SBA loan guaranty was premised solely on [his] posting of collateral consisting of his entire separate property." However, a review of the SBA loan conditions outlined on the loan guaranty authorization refutes this contention. The SBA required nine separate conditions, only two of which necessitated hypothecation of Victor's separate property. Specifically, loan approval required: (1) a second deed of trust on the restaurant property and improvements, (2) Joyce's signature on the promissory note and all instruments of hypothecation, (3) a first lien on the restaurant machinery, equipment, furniture and fixtures presently owned and later acquired with the loan proceeds, (4) acquisition and assignment of an $80,000 life insurance policy on Victor, (5) purchase of hazard insurance on the restaurant property, (6) a third deed of trust on Victor's improved real property in San Diego, already subject to prior liens totalling $107,000, (7)

assignment of 3100 shares of Victor's separate property stock, (8) the furnishing of the restaurant's quarterly balance sheets and profit and loss statements, and (9) the use of the SBA's management assistant services "as deemed necessary by SBA or Bank."

The primary collateral for the loan was the restaurant property. Alone, this hypothecation provides no inference of lender intent; to argue otherwise is to rely on circular reasoning. The requiring of Joyce's signature on the note and instruments of hypothecation does suggest the lender did look toward community assets for security. However, Joyce's signing of the documents, without more, does not compel a finding in favor of the community. (*Ford* v. *Ford, supra,* 276 Cal.App.2d 9, 13-14; *Kenney* v. *Kenney* (1954) 128 Cal.App.2d 128, 138 [274 P.2d 951], disapproved on other grounds in *See* v. *See, supra,* 64 Cal.2d 778, 785-786.) Moreover, given the effect of the antenuptial agreement at the time of the loan, Joyce arguably had few, if any, existing community interests to pledge. Conditions three through five clearly suggest reliance on community interests. Both insurance policies and the restaurant equipment were purchased from the joint restaurant account and were presumptively community property. Indeed, Victor stipulated to the community nature of the restaurant business. Yet, some of the same loan proceeds challenged here were used for operating capital for the restaurant and were specifically earmarked for the purchase of trade fixtures and the liquor license, assets unquestioningly found to belong to the community. This inconsistency clearly contradicts Victor's contention.

Victor nonetheless relies on *Hicks* v. *Hicks, supra,* 211 Cal.App.2d 144, to bolster his argument. In *Hicks,* the trial court made an "implied finding that the proceeds from the loans . . . were the separate property of [husband]." (*Id.,* at p. 153.) Affirming, the Court of Appeal stated: "The trial court was entitled to conclude that the original bank loans were made to the [husband] on the credit of his separate property as, at the time they were obtained, he had been married less than a year and his community earnings were not then of paramount significance, whereas his separate property approximated $500,000 in value." (*Id.,* at p. 155.) However, the court in *Hicks* did not point to any evidence of the lender's actual intent and, indeed, *specifically refrained* from detailing the basis for its conclusion. (*Id.,* at p. 153.) Thus, *Hicks* provides no guidance in determining lender intent in a mixed collateral situation. As one commentator has noted, "Although the *Hicks* case may seem to have been reasonably and correctly decided, in truth it stands as an unfortunate example of an improper assumption regarding a critical factual issue which the *Gudelj* Rule addressed: Whether the lender (or credit seller) *in fact primarily relied* upon separate property of a spouse or upon the general credit of the spouse when credit was extended to that spouse." (*Classifications of Credit Acquisitions, supra,* at p. 216.)

Loan conditions eight and nine demonstrate the SBA's concern about the operation and management of the restaurant business. This interest is wholly consistent with the stated purpose of the SBA: "For the purpose of preserving and promoting a competitive free enterprise economic system, Congress hereby declares that it is the continuing policy and responsibility of the Federal Government to use all practical means and to take such actions as are necessary, consistent with its needs and obligations and other essential considerations of national policy, to implement and coordinate all Federal department, agency, and instrumentality policies, programs, and activities in order to: foster the economic interests of small businesses; insure a competitive economic climate conducive to the development, growth and expansion of small businesses; establish incentives to assure that adequate capital and other resources at competitive prices are available to small businesses; reduce the concentration of economic resources and expand competition; and provide an opportunity for entrepreneurship, inventiveness, and the creation and growth of small businesses." (15 U.S.C.A. § 631a(a); see also Financing Cal. Business (Cont.Ed.Bar 1976) §§ 1.8-1.9, pp. 6-8.) In granting these small business loans, the SBA is constrained by statute and policy considerations. Many of these loan guidelines are outlined in chapter 1 of title 13 of the Code of Federal Regulations. Section 120.2(c)(1), of chapter 1 specifically provides: "No financial assistance shall be extended unless there exists reasonable assurance the loan can and will be repaid pursuant to its terms. Reasonable assurance of repayment will exist *only* where the past earnings record and *future prospects indicate ability to repay the loan and other obligations.* It will be deemed not to exist when the proposed loan is to accomplish an expansion which is unwarranted in light of the applicant's past experience and management ability, or when the effect of making the loan is to subsidize inferior management." (Italics added.) Accordingly, in the absence of evidence the SBA acted contrary to their official duties in this instance (Evid. Code, § 664), we find the loan was extended on both the ability of the community to repay the note and to manage the restaurant. Therefore, the SBA loan funds are a community asset, not Victor's separate property.

■ The second purchase money loan from Home Federal Savings and Loan was secured by a first deed of trust on the restaurant property. Victor presents no evidence to rebut the community presumption and, indeed, concedes the Home Federal loan was likely extended in reliance on the interest in the restaurant property already acquired with the SBA loan funds. Thus, this loan must also be seen as an asset of the community.

Finally, Victor asserts he solely owns the restaurant property by reason of record title. ■ While our courts presume an ownership interest in property is as stated in title (*Gudelj* v. *Gudelj, supra,* 41 Cal.2d 202, 212;

*Socol* v. *King* (1950) 36 Cal.2d 342, 345 [223 P.2d 627]), this presumption may be dispelled by an agreement between the parties that the respective interests should be otherwise. (*Machado* v. *Machado* (1962) 58 Cal.2d 501, 506 [25 Cal.Rptr. 87, 375 P.2d 55]; *Gudelj* v. *Gudelj, supra,* at p. 212.)

Here, Victor took title in his name alone, believing he was entitled to do so under the antenuptual agreement.[3] However, whatever authority the agreement may have granted Victor to take title separately,[4] that authority expired before the dissolution action, and retroactively reinstated the community presumption. Therefore, the community presumption prevails and the presumption arising from the form of title is without force.

In sum, Victor has failed to present sufficient evidence to rebut the presumption property acquired during marriage is community property. Therefore, the restaurant property and all rents, issues and profits thereof are properly characterized as community property.

## II

After the trial, the Legislature passed section 4800.2 which provides: "In the division of community property under this part unless a party has made a written waiver of the right to reimbursement or signed a writing that has the effect of a waiver, the party shall be reimbursed for his or her contributions to the acquisition of the property to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and shall not exceed the net value of the property at the time of the division. As used in this section, 'contributions to the acquisition of the property' include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of property."

By its terms, section 4800.2 applies to actions, such as this one, not yet final on January 1, 1984. (Stats. 1983, ch. 342, § 2; *In re Marriage of Buford* (1984) 155 Cal.App.3d 74, 80 [202 Cal.Rptr. 20].) Thus, Victor

---

[3]Victor's testimony on this point conflicts. However, we are compelled to review the evidence in a light most favorable to the judgment.

[4]On appeal, Joyce argues for the first time Victor breached his fiduciary duties to her in not telling her the restaurant property was recorded in his name alone. (§§ 2228-2234; *Haseltine* v. *Haseltine* (1962) 203 Cal.App.2d 48, 56-57 [21 Cal.Rptr. 238].) She further argues Victor should not now be allowed to profit from his wrongdoing by asserting a presumption based on title. While we need not reach this issue in light of the above reasoning, we do note, under the antenuptual agreement, it was reasonable, though in retrospect incorrect, for Victor to believe the restaurant property was his alone and to record title accordingly.

should be reimbursed for separate property contributions traceable to property acquisitions as defined in section 4800.2. Joyce maintains such reimbursement may be granted *only* for separate property contributions to the restaurant property since Victor failed to cross-appeal. (*Smith* v. *Anglo-California Trust Co.* (1928) 205 Cal. 496, 505 [271 P. 898], disapproved on other grounds in *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 591 [15 Cal.Rptr. 821, 364 P.2d 685].) Here, however, the parties had no occasion to present evidence relevant to section 4800.2 reimbursement. For this reason and the fact Victor's separate property contributions are so apparently interwoven with community acquisitions, we reverse as to the entire property division to effect a just resolution of this case. (*Estate of McDill* (1975) 14 Cal.3d 831 [122 Cal.Rptr. 754, 537 P.2d 874]; *Blache* v. *Blache* (1951) 37 Cal.2d 531, 538 [233 P.2d 547].)[5]

### The Trial Court Did Not Abuse its Discretion in Denying Joyce Attorney's Fees

 Section 4370, subdivision (a) authorizes the court in a dissolution proceeding to order either husband or wife "to pay such amount as may be reasonably necessary for the cost of maintaining or defending the proceeding and for attorneys' fees . . . ." "The need of a spouse for an award of attorney's fees and the amount of that award are matters addressed to the sound discretion of the trial court. [Citation.] The exercise of this discretion will not be disturbed on appeal 'without a clear showing of abuse.' [Citation.]" (*In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 447 [181 Cal.Rptr. 910]; accord *In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 288 [180 Cal.Rptr. 234].) Before trial both Joyce and her attorney received $5,000 from the community proceeds of the restaurant sale. Also Joyce was working at this time as a part-time clerk and was receiving $695 a month in rent from a community residence which she was later awarded. The trial court ruled Joyce had adequate funds to prepare and present her case, and we find no abuse of discretion in this decision.

*Disposition:*

The trial court's denial of attorney's fees is affirmed and the remaining part of the judgment is reversed with directions to the trial court to conduct

---

[5]We direct the attention of the trial court on remand to the comments of the Senate Committee on Judiciary regarding section 4800.2: "Section 4800.2 overrules the case of *In re Marriage of Lucas*, 27 Cal.3d 808, 641 P.2d 285, 166 Cal.Rptr. 853 (1980) (and cases following it), which precluded recognition of the separate property contribution of one of the parties to the acquisition of community property, unless the party could show an agreement between the spouses to the effect that the contribution was not intended to be a gift. Under Section 4800.2, a party making a separate property contribution to the acquisition of the property is not presumed to have made a gift, unless it is shown that the parties agreed it was a gift, but is entitled to reimbursement for the separate property contribution at dissolution of marriage. . . ." (3 Sen.J. (1983-1984 Reg.Sess.) p. 4866.)

further proceedings in harmony with this opinion. Appellant to have attorney fees on appeal.

Brown (Gerald), P. J., and Wiener, J., concurred.