Filed 9/28/15  Marriage of Lakdawala CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of JIMMY and JANICE LAKDAWALA. | D065936 |
| JIMMY LAKDAWALA,<br><br>    Appellant,<br><br>    v.<br><br>JANICE LAKDAWALA,<br><br>    Respondent. | (Super. Ct. No. DN162271) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeannie

Lowe, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Stephen Temko and Dennis Temko for Appellant.

Linda Cianciolo for Respondent.

# I.

## INTRODUCTION

Jimmy Lakdawala (Jimmy) appeals from a judgment in a marital dissolution proceeding involving Jimmy and Janice Lakdawala (Janice).  On appeal, Jimmy contends that the record does not contain substantial evidence to support the trial court's valuation of equipment owned by a printing company that Jimmy and Janice own as community property.  Jimmy also contends that the trial court erred in finding that an entity called Golden Girl, LLC (Golden Girl), which was formed during the marriage, is community property.  Finally, Jimmy contends that the trial court erred in finding that he failed to establish that certain real property that Golden Girl owns is his separate property.  We affirm the judgment.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Procedural background*

Jimmy and Janice were married in 1995.  Jimmy filed a petition for dissolution of marriage in September 2010.  The trial court held a trial on the petition in the fall of 2013 and issued an intended statement of decision in October 2013.  After considering each party's objections to the intended statement of decision, the trial court issued a final statement of decision in December 2013.

B.      *Factual background*

On appeal, Jimmy raises three challenges to the trial court's final statement of decision. We offer a brief overview of the facts relevant to each issue below and provide additional factual background in our discussion of Jimmy's legal claims in part III.A.-C., *post*.

1.      *The valuation of the printing company's equipment*

LAK Advertising, Inc. (LAK) is an integrated marketing communications company formed by Jimmy's family prior to his marriage to Janice. In August 2013, by way of a bifurcated trial, the court determined that LAK is Jimmy's separate property pursuant to the terms of a prenuptial agreement.

Jimmy and Janice formed VDP Direct, LLC (VDP) in 2004. VDP provides printing services, primarily to LAK clients. Both parties agree that VDP is a community asset. In its statement of decision, the trial court reserved jurisdiction for the purpose of determining the value of VDP in dividing the community estate. The trial court appointed its own expert to assist the court in determining the value of VDP[1] and stated that the court's expert was to value VDP's equipment at $1,900,810. In determining this amount, the court explained that it had relied on an appraisal of the equipment performed by Marcus Pigrom, an expert hired by Janice.

---

[1]     The court explained that the opinions of the parties' experts as to the value of VDP were so divergent that it was "unable to render a decision on the value of VDP without the assistance of its own expert."

3

## 2. *The characterization of Golden Girl as a community asset*

Golden Girl is an entity formed after the parties' marriage for the purpose of purchasing a commercial building on Ruffin Road (the Ruffin Road property) to house LAK and several other tenants. At the time of its formation, Jimmy contributed $20,000 to Golden Girl, and his mother contributed $200. Jimmy became a 99 percent member of Golden Girl and his mother became a one percent member. Jimmy's mother transferred her interest to Jimmy in 2002. The court found that Golden Girl is 99 percent community property and one percent Jimmy's separate property. In support of this determination, the court found that Jimmy had failed to establish that the initial $20,000 contribution used to fund Golden Girl came from Jimmy's separate property.

## 3. *The Ruffin Road property*

Shortly after its formation, Golden Girl purchased the Ruffin Road property for $935,000. The purchase was financed with several different loans. Golden Girl obtained two loans from the Small Business Administration (SBA) to fund the bulk of the purchase price. Golden Girl also financed the purchase with a smaller loan from Jimmy's parents.[2] In addition, Jimmy testified that he contributed two additional sources of financing toward the purchase of the Ruffin Road property—$68,005 from a home equity

---

[2] The trial court found that the Ruffin Road property was financed in part with a "loan" from Jimmy's parents in the amount of $160,000. Jimmy testified that his parents financed the purchase in part with two loans totaling $141,000. Janice testified that Jimmy's parents partially financed the purchase with a loan in the amount of $80,000.

line of credit on a house that he purchased prior to the marriage, and $25,000 from a line of credit maintained by LAK.

## III.

## DISCUSSION

A.   *There is substantial evidence in the record to support the trial court's determination of the value of VDP's equipment*

Jimmy contends that there is not substantial evidence in the record to support the trial court's valuation of VDP's equipment. Specifically, Jimmy maintains that the trial court erred in basing its valuation on Janice's expert's appraisal of the equipment, contending that the appraisal is "speculative" and "useless" since it "failed to account for wear and tear."

1.   *Factual and procedural background*

At trial, the court received in evidence an appraisal of VDP's equipment prepared by Pigrom, Janice's expert. Pigrom's appraisal contained detailed information with respect to both the equipment that he appraised and the process he used to prepare the appraisal. Pigrom stated in the appraisal that "[t]he level of maintenance [of the equipment] was observed as well as the method of installation." In addition, Pigrom indicated that he used a cost approach to value some of the equipment, in which the value of the "equipment was based on its estimated replacement cost new less depreciation." Pigrom explained that "[d]epreciation is based on effective age, remaining economic life, observed physical condition and economic and functional obsolescence." The appraisal

5

also contained a certification stating that it had been prepared in conformity with the Uniform Standards of Professional Appraisal Practice. Pigrom valued VDP's equipment at $1,970,810.

Pigrom testified at trial concerning his appraisal. Pigrom stated that he is an accredited senior appraiser of the American Society of Appraisers and that he has performed fixture and equipment appraisals since 2005, including four or five involving printing companies.

Pigrom explained that there are three valuation methods established by the American Society of Appraisers: cost approach, market approach. and income approach. Pigrom used a combination of the market approach and cost approach in valuing VDP's equipment. Consistent with the description provided in the appraisal, Pigrom explained that when utilizing the cost approach, an appraiser determines the item's replacement cost and then decreases that value by some amount in order to account for depreciation. Pigrom explained the methods that may be used to determine depreciation, as follows:

> "There [are] different things you can use. There's functional obsolescence, physical obsolescence and . . . there's wear and tear on machinery when it's in use, so you have to account for that, and the most . . . common way to depreciate those assets is based on an age-life analysis."

Pigrom described the manner by which he performed an age-life analysis with respect to VDP's equipment, stating:

6

"Well, I had some information from the asset list or the depreciation schedule so I was familiar [with] when some of the equipment was acquired, the age of the equipment, and so . . . you come up with an estimated normal life of the equipment and you do that age-life analysis, and you can depreciate the equipment using that age-life analysis."

On cross-examination, Pigrom acknowledged that he had not determined the number of impressions[3] that each piece of printing equipment had performed.

On redirect, the following colloquy occurred:

"[Janice's counsel]: So if you didn't get to consider the number of impressions, what did you consider about the usable life of the equipment?

"[¶] . . . .[¶]

"[Pigrom]: Right. Well, while I was there, I saw the majority of the equipment in use and it was doing its job and it seemed like it was in good condition, so I had to make assumptions that the equipment that I saw was in good working order or good working condition, so that's . . . what I used."

Pigrom confirmed that making such assumptions is consistent with standard appraisal practices and said that he had used a depreciation schedule in calculating the value of VDP's equipment. Jimmy's counsel "stipulate[d] the report [i.e. Pigrom's appraisal] complies with the uniform professional standards."

The trial court also received in evidence a valuation of VDP's equipment performed by Kian Hemmen, a salesman for a company from which Jimmy had

---

3    Jimmy testified that the term "impressions" refers to the number of "printouts [a printer] has printed out," and explained that a printer's "counter" records the number of impressions that the printer has performed.

7

purchased printing equipment in the past. Hemmen valued VDP's equipment at $1,202,100. Hemmen testified that he performed the valuation by comparing VDP's equipment to similar equipment that his company or other similar companies had sold. Hemmen acknowledged that he and Jimmy had "become good friends" and said that Jimmy was "one of my favorite customers."

The trial court issued an intended statement of decision in which it valued VDP's equipment at $1,900,810. The court explained that it based its valuation on Pigrom's appraisal. Jimmy filed an objection to the memorandum of decision in which he contended that the court erred in relying on Pigrom's analysis for numerous reasons, including that Pigrom "failed to check the counters on any of the printing machines" and was thus "blindly guessing as to the actual value of such equipment."

The court issued a final statement of decision that was consistent with its memorandum of intended statement of decision. The final statement of decision stated in relevant part:

> "The court relies on Mr. Pigrom's report based on his training, experience, accreditation as a senior appraiser and his compliance with uniform standards of a professional appraiser. Based on evidence received, the court has adjusted the appraised value downward by a reduction of $70,000 for items 55 and 56, which are tenant improvements. The revised value of the VDP equipment, including vehicles is $1,900,810."

8

With respect to Hemmen's valuation, the court noted that Hemmen was an equipment consultant and not an appraiser, and that Hemmen did not have the same training or qualifications as Pigrom. The court also stated that it did not consider Hemmen to be "unbiased" in light of his personal and professional relationship with Jimmy.

2.     *Governing law and standard of review*

In a marital dissolution action, a trial court " 'has broad discretion . . . to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal.' " (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.)

" 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation] . . . Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.] . . . [¶] The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651-652.)

3.     *Application*

Jimmy contends that Pigrom's appraisal is speculative because Pigrom lacked evidence as to the actual wear and tear of the equipment. Jimmy further maintains that Pigrom's reliance on a depreciation schedule is not an adequate substitute for evidence of

9

actual wear and tear because it bears no relation to the actual condition or value of the equipment at issue. We are not persuaded.

Pigrom testified that the most "common way used to depreciate . . . assets is based on an age-life analysis," and said that he performed such an analysis in this case. Pigrom also testified that he observed VDP's equipment to be in a good working order, that he made assumptions concerning the useful life of the equipment based on a depreciation schedule, and that making such assumptions is consistent with standard appraisal practices. We are aware of no authority, and Jimmy cites none, that supports Jimmy's contention that an appraisal issued in conformity with such standard practices does not "rise to the dignity of substantial evidence."

Jimmy's arguments in support of his claim are not persuasive. He notes that the definition of depreciation provided in Pigrom's appraisal states: "A loss in value from all causes, including factors of deterioration **and** functional and/or economic obsolescence, as of a specific date." (Emphasis added by Jimmy.) Jimmy asserts, without any citation to authority, that a depreciation schedule measures only *functional or economic obsolescence* and fails to account for *deterioration*. However, as Pigrom's testimony indicated, a depreciation schedule is used to measure the "estimated normal life of the equipment," and thus provides an estimate of the average deterioration of the appraised

10

item. Accordingly, we reject Jimmy's contention that, "Pigrom did not follow the standards applicable to his own field as stated in his report."[4]

In *Texaco, Inc. v. County of Los Angeles* (1982) 136 Cal.App.3d 60 (*Texaco*), the court rejected an argument similar to the one Jimmy advances. In that case, an assessor valued an oil refinery owned by the plaintiff. The plaintiff contended that the assessor's valuation "should have been substantially less" (*id*. at p. 62), and that the assessor's valuation was improper because "the assessor did not use a separate factor for computing depreciation due to normal wear and tear from that used to compute depreciation due to obsolescence." (*Id.* at p. 63.) The *Texaco* court rejected this argument, noting that the assessor had testified that "his formula had taken into account both elements of depreciation." (*Ibid*.)

The *Texaco* court also distinguished *Bret Harte Inn, Inc. v. City and County of San Francisco* (1976) 16 Cal.3d 14, upon which Jimmy relies in his reply brief. In *Bret Harte Inn*, "the assessor had applied a common depreciation ratio to all buildings of the same class regardless of the age of obsolescence among them." (*Texaco, supra*, 136 Cal.App.3d at p. 63.) In contrast, in *Texaco*, "the assessor evaluated each divisible unit of the plant separately, the use of the same estimated life thereby resulting in a different ultimate value for each unit." (*Ibid*.) Similarly in this case, Pigrom appraised each piece of equipment separately using a depreciation schedule.

---

[4]     Jimmy's counsel stipulated at trial that Pigrom's appraisal complied with these standards.

Jimmy also contends that the "absurd[ity]" of relying solely on a depreciation schedule rather than evidence of actual wear and tear with respect to each piece of equipment is demonstrated by a hypothetical situation in which one attempts to value a car without knowing the number of miles the car has been driven. Jimmy maintains that "the same princi[ples] apply" with respect to valuing the equipment at issue in this case. We are not persuaded. Pigrom testified that he used a depreciation schedule in a manner consistent with standard appraisal practices. To paraphrase the *Texaco* court, "[t]he law requires only that an [appraiser] adopt and use a reasonable method." (*Texaco*, *supra*, 136 Cal.App.3d at p. 63.) Jimmy cannot establish that the trial court erred in relying on an appraisal based on the use of a depreciation schedule "merely because, in [Jimmy's] nonexpert opinion, another method might have been better." (*Ibid*.)

Finally, *In re Marriage of Rives* (1982) 130 Cal.App.3d 138 and *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, which Jimmy cites in his brief, both involved valuation issues distinct from that present in this case. *Rives* involved an expert's valuation of a business's goodwill (*Rives, supra*, at p. 152), and *Zuckerman* involved the valuation of storage rights to a gas reservoir in an eminent domain action (*Zuckerman*, *supra*, at p. 1121). Neither case provides support for the contention that the record in this case lacks substantial evidence to support the trial court's finding as to the value of VDP's equipment.

Accordingly, we conclude that there is substantial evidence in the record to support the trial court's determination of the value of VDP's equipment.

B.    *The trial court did not err in finding that 99 percent of Golden Girl is community property*

Jimmy contends that the trial court erred in finding that 99 percent of Golden Girl is a community property asset.[5]  Specifically, he argues that the court applied the "wrong standard" in determining that Golden Girl is community property.  Jimmy also maintains that he met his burden to demonstrate that Golden Girl was funded with separate property.

1.    *Standards of review*

Jimmy's contention that the trial court applied the "wrong standard" is a legal question that we review de novo.  (See *In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578, 1584 ["The trial court's selection of what legal principles to apply is subject to de novo review"].)

We apply the substantial evidence standard of review to Jimmy's contention that he demonstrated that Golden Girl was funded with separate property.  (See *In re Marriage of Walker* (2012) 203 Cal.App.4th 137, 152 [" ' "Appellate review of a trial court's finding that a particular item is separate or community property is limited to a determination of whether any substantial evidence supports the finding" ' "].)

---

5      The trial court found that one percent of Golden Girl became Jimmy's separate property by virtue of Jimmy's mother's transfer of her one percent interest in the entity. The court found that the remaining interest in Golden Girl was community property. The trial court's finding that 99 percent of Golden Girl is community property is the only finding at issue in this appeal. Thus, in referring to "Golden Girl" throughout this section we refer solely to that 99 percent of Golden Girl at issue in this appeal.

2.      *Governing law*

In *In re Marriage of Valli* (2014) 58 Cal.4th 1396 (*Valli*), the Supreme Court

outlined the following law governing a trial court's characterization of the parties'

property in a marital dissolution action:

> "In a marital dissolution proceeding, a court's characterization of the parties' property—as community property or separate property—determines the division of the property between the spouses. [Citations.]  Property that a spouse acquired before the marriage is that spouse's separate property.  [Citation.]  Property that a spouse acquired during the marriage is community property  [Fam. Code, § 760][6]  unless it is (1) *traceable to a separate property source* [citations], (2) acquired by gift or bequest [citation], or (3) earned or accumulated while the spouses are living separate and apart [citation].  A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence."  (*Valli, supra*, at p. 1399, italics added.)

3.      *The trial court did not apply the wrong standard in determining that Golden Girl is 99 percent community property*

Jimmy contends that the trial court applied the "wrong standard" in requiring that

he "perform a strict document trace" in order to prove that Golden Girl was initially

funded with his separate property.  Quoting *In re Marriage of Ficke* (2013) 217

Cal.App.4th 10, 25 (*Ficke*), Jimmy notes that the "need for specific record tracing arises

---

6      Section 760 provides, "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property."

14

when there is a *commingled* account,"[7] and argues that there was no need for such tracing in this case because "[i]t was uncontroverted [Jimmy] funded Golden Girl with a separate property account that was never commingled with community funds."

We are not persuaded. To begin with, it was far from "uncontroverted" that Jimmy initially funded Golden Girl with his separate property. The manner by which Golden Girl was funded was a hotly contested issue at trial. During closing argument, Janice's counsel cited the community property presumption in Family Code section 760[8] and argued that the "$20,000 [used to initially fund Golden Girl] was not traced to a

---

[7]    A commingled account is one in which separate and community property funds have been combined. (See *Ficke*, *supra*, 217 Cal.App.4th at p. 25.) There are two methods that California courts use to trace separate property contained in a commingled account—the direct tracing method and the family living expense or recapitulation method:

> "Under the 'direct tracing' method, the disputed asset . . . is traced to the withdrawal of separate property funds from the commingled account. This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. . . . [¶] Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expenses, so that the payments or purchase necessarily must have been made with separate property funds. [Citations.]" (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823.)

[8]    All statutory references are to the Family Code unless otherwise specified. Janice's counsel argued, "The foundation of community property law in California is [section] 760, that everything you acquire during marriage is presumed to be community property."

15

separate property source."  In contrast, Jimmy's counsel argued that "tracing all the transactions indicates that Golden Girl, Inc., is Jimmy's separate property."

The trial court similarly did not apply the "wrong standard" in finding that Jimmy had not successfully rebutted the community property presumption.  The trial court indicated that the absence of any documentary evidence that Jimmy maintained a bank account containing separate property funds at the time of Golden Girl's initial funding was *relevant* in determining whether he had rebutted the community property presumption,[9] but did not *require* that Jimmy produce such evidence.  There is nothing in *Ficke* that would suggest that the trial court's reasoning is erroneous.

In *Ficke*, the Court of Appeal affirmed a trial court's finding that a husband had established that certain mortgage payments made during his marriage on a piece of real property (Boardwalk) that the husband had purchased prior to the marriage were made with the husband's separate property.  (*Ficke, supra*, 217 Cal.App.4th at p. 26.)  The *Ficke* court rejected the wife's contention that the trial court had erred because the husband "was *required* to produce specific records (e.g., bank account statements) which would have shown the rents from Boardwalk were used to make the mortgage payments,

---

9       The trial court stated:
    "Jimmy was unable to submit any documents to prove he held a
    separate bank account in 1997.  According to Jimmy, his $20,000
    contribution was drawn on a separate account held at Glendale
    Federal and that the bank has subsequently changed hands making
    his ability to provide bank statements, cancelled checks or any
    documentary evidence of the withdrawal of these funds from a
    separate source impossible."

16

and that absent such specific documentation, the court was *necessarily* required to assume the mortgage payments came from community property." (*Id.* at p. 25, italics added.) The *Ficke* court rejected the wife's claim because "[t]he need for specific record tracing arises when there is a *commingled* account" (*ibid.*), and there was substantial evidence that there was no such commingled account in *Ficke*. (*Id.* at p. 26.)

However, the *Ficke* court did not state that bank statements demonstrating that the mortgage payments came from separate property would have been *irrelevant* in proving the husband's contention. Rather, the *Ficke* court merely stated that such statements were not *required*. Further, the *Ficke* court emphasized that it was the trial court's role, as the trier of fact, to weigh the conflicting evidence as to the characterization of the source of the mortgage payments and determine whether the payments had come from a community or separate property source:

> "The evidence before the trial judge as to whether there was a commingled account from which mortgage payments had been made (e.g., an account into which both rents and salary had been deposited), or alternatively, a community account from which mortgage payments were made, was in conflict. Based on [husband's] testimony alone, the trial court was perfectly entitled to believe [husband] rather than [wife], and impliedly find there was no commingling or payments from a community account." (*Ficke, supra*, 217 Cal.App.4th at pp. 26-27.)

So, too, in this case, it was up to the trial court to weigh Jimmy's evidence and determine whether he had rebutted the community property presumption contained in section 760. The trial court did not err under *Ficke* in suggesting that the absence of any documentary evidence of the existence of a bank account containing separate property at

17

the time of Golden Girl's funding was relevant in determining whether Jimmy had funded Golden Girl with separate property.

Further, the trial court did not state that the *only* way that Jimmy could establish that Golden Girl was his separate property was through bank statements and/or either the "direct tracing" or "family expense" method of tracing. (*In re Marriage of Braud*, *supra*, 45 Cal.App.4th at p. 823.) In fact, the court did not mention "specific record tracing" at all in its statement of decision. (*Ficke, supra*, 217 Cal.App.4th at p. 25.) The trial court specifically discussed evidence *other* than bank statements in finding that Jimmy had not adequately established that the initial contribution to Golden Girl came from his separate property. For example, the court explained its determination that evidence from Golden Girl's ledger was inadequate to establish that Golden Girl's initial funding came from Jimmy's separate property, as follows:

> "Jimmy relies on a single entry from the Golden Girl ledger . . . which indicates a contribution from Jimmy Lakdawala in the sum of $20,000. Jimmy asks the court to distinguish this single ledger entry with 'Jimmy Lakdawala' as proof the funds came from his separate funds from later entries on the ledger when funds came from or to both parties [where] both names were entered, 'Janice and Jimmy Lakdawala.' The court is unable to draw this distinction as no evidence of who prepared this ledger was provided nor was there any evidence whether the same person also prepared the later entries upon which Jimmy now relies."

The fact that the trial court stated in its decision, "Jimmy has not sufficiently traced the $20,000 initial contribution," does not demonstrate, as Jimmy maintains, that the trial court "based its decision on a requirement that [Jimmy] provide a direct or family

18

expense tracing."  Both Jimmy's counsel and a family law forensic accounting expert that Jimmy called to testify used forms of the word "trace" in describing Jimmy's attempt to demonstrate that Golden Girl had been funded by separate property.  The forensic accountant expert testified that "[t]racing is the key to this case," and claimed that he had examined the "tracing of the capital investment in Golden Girl."  Jimmy's counsel argued that "tracing all the transactions indicates that Golden Girl, LLC, is Jimmy's separate property."  In a trial brief, with respect to the character of Golden Girl, Jimmy argued, "[Jimmy] is permitted to trace his separate property into the establishment of the company and by so doing establish its separate property character."  Thus, both Jimmy's counsel and his expert used forms of the word "trace" to refer generally to efforts to establish that a disputed property was funded with separate property.  Further, California courts often use forms of the word "trace" in a manner similar to that employed by Jimmy's counsel and his expert.  (See, e.g., *Valli*, *supra*, 58 Cal.4th at p. 1399 ["Property that a spouse acquired during the marriage is community property . . . unless it is . . . *traceable* to a separate property source" (italics added)]; *In re Marriage of Finby* (2013) 222 Cal.App.4th 977, 983-984 ["Cases have recognized that . . .  section 760 creates ' "a general presumption that property acquired during marriage by either spouse . . . is community property unless *traceable* to a separate property source" ' " (italics added)].)

The most reasonable interpretation of the trial court's statement that "Jimmy has not sufficiently traced the $20,000 initial contribution," is merely that Jimmy did not

19

establish that Golden Girl was funded with separate property, and not, as Jimmy claims, that the court required direct or family expense tracing.

Accordingly, we conclude that the trial court did not apply the "wrong standard "in determining that Golden Girl is community property.

4. *There is substantial evidence to support the trial court's finding that Golden Girl is a community asset*

It is undisputed that Golden Girl was acquired during the marriage and that the community property presumption contained in section 760 therefore applies.[10] (See fn. 6, *ante*.) It was therefore Jimmy's burden to rebut the presumption by a preponderance of the evidence. (See *In re Marriage of Ettefagh*, *supra*, 150 Cal.App.4th at p. 1591.) There is substantial evidence in the record to support the trial court's finding that Jimmy failed to rebut this presumption.

As the trial court noted in its statement of decision, Jimmy did not provide any documentary evidence establishing the existence of a bank account containing Jimmy's separate property, much less bank statements or cancelled checks demonstrating that such an account was used to fund Golden Girl. Jimmy's evidence as to the source of Golden Girl's initial funding was equivocal—he stated that he "believed" that the check was drawn on an account at a bank called "Great Western." However, Jimmy also offered the

---

10 Regarding the characterization of Golden Girl, in a trial brief, Jimmy stated, "[Janice] is correct that because [Jimmy] formed Golden Girl, LLC during marriage, the presumption arises that [it] is community property under [section 760]."

20

declaration of Louis Cumming, a commercial banking expert,[11] who stated, "It appears that the $20,000 cash was drawn from [Jimmy's] sole and separate property in the form of a 'draw' on a home equity line of credit on the separate Penasquitos residence or a $25,000 draw on LAK Advertising, Inc. line of credit."[12]  The trial court reasonably considered these deficiencies in Jimmy's evidence in finding that he had failed to rebut the community property presumption.  Finally, the trial court provided a reasonable explanation for why it did not find the Golden Girl ledger evidence to be compelling (see pt. III.B.3., *ante*).  The court was not required to credit Jimmy's testimony that he had funded Golden Girl with his separate property.  (*In re Marriage of Hofer* (2012) 208 Cal.App.4th 454, 460 ["The trier of fact may reject even uncontradicted evidence as not credible"].)

Accordingly, we conclude that there is substantial evidence to support the trial court's finding that Golden Girl is community property.

---

[11]    Cumming stated his opinion concerning the intent of the lender who made the SBA loans that were the primary source of financing for the purchase of the Ruffin Road property.  We discuss Cumming's testimony in detail in part III.C.2., *post*.

[12]    We are not persuaded by Jimmy's contention that his "ability to produce records" supporting his contention that he funded Golden Girl with separate property was "hindered" by the fact that the parties' house was destroyed in a fire.  While Jimmy cites to evidence in the record that the parties' house was destroyed in a fire, he cites to no evidence that the fire impeded efforts to support his contention that he funded Golden Girl with separate property.

21

C.  *The trial court did not err in failing to grant Jimmy a separate property interest in the Ruffin Road property pursuant to the lender intent doctrine*

Jimmy contends that the trial court erred in failing to grant him "a separate property interest in Ruffin Road."  Jimmy argues that he was entitled to such interest because the evidence presented at trial demonstrated that the lenders who financed the purchase of the Ruffin Road property relied "solely upon [Jimmy's] separate property."

We apply the substantial evidence standard of review to Jimmy's claim.  (See *In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1187 (*Grinius*) [concluding record lacked substantial evidence to support trial court's characterization of real property as husband's separate property by way of the lender intent doctrine].)

1.  *Governing law*

As discussed in part III.B., *ante*, section 760 creates a general presumption that property acquired during marriage is community property.  "The character of property as separate or community is determined at the time of its acquisition."  (*See v. See* (1966) 64 Cal.2d 778, 783 (*See*).)

"[T]he character of credit acquisitions during marriage is 'determined according to the intent of the lender to rely upon the separate property of the purchaser or upon a community asset.' "  (*Grinius, supra*, 166 Cal.App.3d at p. 1186.)  "Loan proceeds acquired during marriage are presumptively community property; however, this presumption may be overcome by showing the lender intended to rely solely upon a

22

spouse's separate property and did in fact do so. Without satisfactory evidence of the lender's intent, the general presumption prevails." (*Id.* at p. 1187.)[13]

   2.   *Application*

Jimmy contends that he is entitled to a separate property interest in the Ruffin Road property because the "lenders intended to rely solely on [Jimmy's] property when Golden Girl was extended credit to purchase the property." We disagree.

To begin with, it is undisputed that *Golden Girl*, not Jimmy and Janice individually, purchased the Ruffin Road property. Ruffin Road thus became an asset of Golden Girl. Since we have concluded that there is substantial evidence to support the trial court's finding that Golden Girl is community property (see pt. III.B., *ante*), even assuming that Jimmy contributed loans secured by his separate property to Golden Girl, that would not change the community nature of the ownership of Golden Girl. (See *See*, *supra*, 64 Cal.2d at p. 783 [character of property is determined at the time of its

---

[13]   In *Grinius*, this court noted that in *Gudelj v. Gudelj* (1953) 41 Cal.2d 202 (*Gudelj*), the Supreme Court stated, " 'In the absence of evidence tending to prove that the seller *primarily* relied upon the purchaser's separate property in extending credit, the trial court must find in accordance with the [community property] presumption.' " (*Grinius, supra*, 166 Cal.App.3d at pp. 1186-1187, quoting *Gudelj, supra,* at p. 210, italics added by *Grinius*.) The *Grinius* court nevertheless held that the proper standard is whether the "lender intended to rely *solely* upon a spouse's separate property" (*Grinius, supra*, at p. 1187, italics added) rather than "*primarily* relied" on a spouse's separate property (*Gudelj, supra,* at p. 210, italics added by *Grinius*). The *Grinius* court reasoned that the *Gudelj* court cited "no authority" for this "apparent change" and that the *Gudelj* court "had no opportunity to apply the standard since no evidence of lender reliance on separate property was proffered [in *Gudelj*]." (*Grinius, supra*, at p. 1187.) For the reasons stated in the text, Jimmy's claim fails under either standard.

acquisition].)[14]  The trial court thus did not err in including Ruffin Road among the assets owned by Golden Girl, and dividing the 99 percent of Golden Girl owned by the community equally between Jimmy and Janice.

Even assuming that the lender intent doctrine could potentially apply in this context, the trial court did not err in finding that Jimmy failed to establish that the lenders who funded the purchase of the Ruffin Road property relied primarily on Jimmy's separate property.  Jimmy's argument on appeal is based on his testimony and that of commercial banking expert Louis Cumming.  Cumming opined that the lender who made the SBA loans relied entirely on Jimmy's separate property in financing the Ruffin Road acquisition.  However, Cumming's opinion was based on the premise that the loans were "made to Golden Girl, *which is owned by Jimmy*."  (Italics added.)  Cumming testified, "The primary source of repayment for [the SBA loans] is the income to Golden Girl as the owner of the property, which would then become the rental stream from one or more tenants in the building."  Since we have concluded that there is substantial evidence to support the trial court's finding that Golden Girl is *community* property, Cumming's

_____

14    In his brief, Jimmy made no claim that he is entitled to reimbursement for separate property contributions that he made to Golden Girl.  (See § 2640, subd. (b) ["In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source"].)  At oral argument, Jimmy's counsel suggested for the first time on appeal that Jimmy would potentially be entitled to such reimbursements if the court were to conclude that Golden Girl is community property.  It is well established that " '[w]e do not consider arguments that are raised for the first time at oral argument.' " (*Palp, Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 291, fn. 2.)

24

testimony that the primary source of payments on the loans would be Golden Girl's income (i.e. community income) not only does not support a finding that the lender intended to rely solely on Jimmy's separate property in making the SBA loans, but supports a contrary finding. The trial court could have reasonably rejected Cumming's testimony in part on the additional ground that Cumming acknowledged that he had not seen the loan application that Jimmy submitted to the lender and acknowledged that he had not received any documents directly from the lender. In sum, Cumming's testimony does not establish that the trial court erred in failing to grant Jimmy a separate property interest in Ruffin Road pursuant to the lender intent doctrine.

With respect to Jimmy's testimony, Jimmy stated that the purchase of the Ruffin Road property was financed in part from two loans from his parents and additional funds that he claimed were secured by his separate property. However, given the lack of documentary evidence supporting such testimony, the trial court could have reasonably found that Jimmy had not adequately established that the lenders that provided such loans intended to rely solely upon Jimmy's separate property.[15] The trial court could therefore have reasonably found that Jimmy's evidence did not constitute "satisfactory evidence of

---

[15]     In a supplemental brief, Jimmy contends that his parents loaned "$141,000 to Golden Girl" for the purchase of the Ruffin Road property and that, since the loans were made to "Golden Girl and not [Jimmy], the parents did not rely upon the community credit." This claim fails in light of our conclusion in part III.B., *ante*, that there is substantial evidence to support the trial court's finding that Golden Girl is community property and not Jimmy's separate property. Even assuming that Jimmy established that his parents' loans were made to Golden Girl, this evidence would not establish that Jimmy's parents relied solely on Jimmy's separate property in making the loans.

the lender's intent," and thus, that "the general presumption prevail[ed]." (*Grinius, supra*, 166 Cal.App.3d at p. 1187.)

Accordingly, we conclude that the trial court did not err in failing to grant Jimmy a separate property interest in the Ruffin Road property pursuant to the lender intent doctrine.

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McINTYRE, Acting P. J.

O'ROURKE, J.

26