Filed 9/30/16  Marriage of Klingler CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of LAWRENCE R. and SYLVIA KLINGLER. <br><br> LAWRENCE R. KLINGLER, <br><br>　　Respondent, <br><br>　　　　v. <br><br> SYLVIA KLINGLER, <br><br>　　Appellant. | G051548 <br><br> (Super. Ct. No. 11D010380) <br><br> O P I N I O N |

　　　　Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Reversed and remanded with directions.

　　　　The Law Offices of Saylin & Swisher, Brian G. Saylin, Lindsay L. Swisher and Daniela A. Laakso for Appellant.

　　　　Hughes and Hughes and Lisa Hughes for Respondent.

　　　　　　　　　　*　　　　　*　　　　　*

One of the bedrock principles of appellate law is that appellate courts review results, not rationales. It is a "settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning." (*Green v. Superior Court* (1985) 40 Cal.3d 126, 138; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.) Thus, absent a showing that trial court error affects *the outcome* of the case, reversal of the judgment is not warranted. In this case, however, appellant Sylvia Klingler has ignored this principle. She appeals the judgment dissolving her marriage to respondent, Lawrence R. Klingler (Larry),[1] arguing only that the trial court committed various analytical errors in the course of arriving at that judgment. Sylvia does not link any of those errors to a specific provision of the judgment – which spans 35 pages – or specify how the judgment would have been different in the absence of these purported errors.[2]

This makes our job significantly more difficult. That being said, however, we infer Sylvia's primary contention is that absent the claimed errors, the court's judgment would not have characterized the parties' marital residence – a property both parties refer to as "Observatory" – as Larry's separate property. We agree. The court's characterization of Observatory was based on a flawed legal analysis, and we conclude

---

[1] As the parties share the same last name, we refer to each by their first name for the sake of clarity. No disrespect is intended.

[2] In the introduction to her opening brief, Sylvia tells us she "contends that, though informed of the legal issues, and although provided with legal authority as to those authorities, . . . the trial court did not apply the applicable law. In so doing, the trial court abused its discretion and the resulting judgment should be reversed." In the conclusion of her opening brief, Sylvia recites "[i]t is respectfully submitted that the trial court has, in the instances above, failed to apply the applicable law and, as such has abused its discretion. For this the judgment should be reversed." In between those statements, Sylvia identifies the errors she claims, but does not explain how any single error, or combination of them, resulted in the wrong outcome.

the judgment must be reversed on this point and the case remanded with directions to reconsider whether Observatory was community property.

Sylvia also contends the court committed two errors in connection with calculating the community's interest in one of Larry's separate properties – referred to as Pavona – under the so-called "*Moore-Marsden*" rule.[3] First, she claims the court adopted a flawed tracing analysis employed by Larry's forensic accountant, which allowed mortgage payments made in connection with Pavona – to be traced to Larry's separate property funds even when the comingled bank account from which those payments were made contained no separate funds. However, in making this assertion, Sylvia does not identify the specific payments she complains of, nor does she explain how the judgment would have been different if those disputed payments had been credited in the manner she believes appropriate. Instead, she simply asserts the accountant's "calculation . . . must be reversed." This is an insufficient showing to justify reversal of anything. Perhaps more significant, Larry points out that Sylvia *stipulated* to the accountant's calculation of the amount the Pavona mortgage had been paid down with community funds. We consequently conclude the issue is waived.

And second, Sylvia contends the court erred by not crediting the community with the proceeds of loans taken out during the marriage to refinance the mortgages on both Observatory and Pavona. But she has utterly failed to support her argument with evidence. We can discern from her opening brief the timing of the Observatory refinance – March 2008 – but nothing more. As for Pavona, we cannot even discern that. Consequently, that issue is waived as well.

---

[3] "When community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property. [Citations.] This well-established principle is known as 'the *Moore/Marsden* rule.'" (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421–1422.)

3

# I

# FACTS

Many of the facts relevant to this appeal are undisputed. The Pavona property was purchased by Larry in November 1998, approximately three years before the parties were married in January 2002. The parties agree Pavona is Larry's separate property. Following their marriage, Larry and Sylvia resided at Pavona, and during that time, the mortgage was paid with community funds. The parties stipulated the community was entitled to credit for those payments, under the *Moore/Marsden* rule.

By April 2005, after the parties had moved to the Observatory property and Pavona had been rented out, the rent payments it generated – treated as Larry's separate property income – were deposited into a comingled bank account that also held community funds. Adopting the findings of Larry's forensic accountant, the trial court found that the mortgage payments for Pavona were thereafter made from Larry's separate property, traced to that separate property rental income.

Observatory was purchased in December 2004, with a down payment of either $567,000 or $667,000.[4] All but $67,000 of that down payment came from a line of credit (HELOC) secured by equity in the Pavona property, and the remaining $67,000 was taken from Larry's separate property investment account. At the time Larry obtained the HELOC, he represented to the lender that his separate property included not only Pavona, which he valued at $2 million, but also a property in New Hampshire he valued at $300,000, and a property in Irvine he valued at $850,000. The record contains no evidence of what representations Larry made about the extent of his community property.

---

[4] The uncertainty as to the amount comes from the fact the parties seem to agree that Larry used the entirety of a $600,000 home equity line of credit, plus the $67,000 in investment funds, to make the down payment. However, the court's finding was that he "used 500,000 from the home equity line of credit . . . as a down payment on 8 Observatory."

4

The balance of Observatory's purchase price was paid by a loan in the amount of $1,658,000, taken out in Larry's name alone.

The deed to Observatory reflects it was conveyed to Larry as his separate property. Shortly after that deed was issued, Sylvia signed an "Interspousal Transfer Grant Deed." That deed specifies it is a "transfer to a spouse or former spouse in connection with a property settlement agreement or decree of dissolution of a marriage or legal separation," although there is no evidence either spouse was contemplating dissolution or legal separation at that time. It then states that Sylvia grants the Observatory property to Larry, and recites "[i]t is the express intent of [Sylvia], being the spouse of [Larry] to convey all right, title and interest of [Sylvia], community or otherwise, in and to the herein described property to [Larry] as his/her sole and separate property."[5] By way of interlineation, the deed specifies the transfer is for no consideration.

The mortgage payments for Observatory were made from community funds. In March 2008, the purchase loan for Observatory was refinanced solely for the purpose of reducing the interest rate. The new loan was also taken out in Larry's name alone. The court found that Observatory did not appreciate in value between the date of its purchase and the date of trial.

The parties separated in September 2011.

---

[5] The date typed just above Sylvia's signature on this interspousal deed is December 16, 2004, although the attached notary certification reflects she appeared before the notary on December 23, 2004.

II

DISCUSSION

1. *Community Ownership of Observatory*

Sylvia's primary contention appears to be that the trial court erred by concluding Observatory was Larry's separate property, rather than a community asset. Sylvia's argument can be summarized as follows: (1) Because Observatory was purchased during the marriage, it is presumptively community property, and that community property presumption can be rebutted only by evidence the property was purchased with separate assets, without reliance on community income; (2) The HELOC secured by Pavona, which was used for Observatory's down payment, was presumptively community property, and Larry failed to offer evidence to overcome that presumption; (3) the grant deed from the seller, which designated the property as Larry's separate property, cannot be relied upon to establish its character; (4) the Interspousal Transfer Grant Deed Sylvia signed was presumptively the product of undue influence, and there is no substantial evidence to overcome that presumption; and (5) Larry breached a fiduciary obligation to offer the community the opportunity to purchase the Observatory property before acquiring it as his separate property.

a. *Observatory was presumptively community property*

Family Code section 760, states "except as otherwise provided by statute, *all property*, real or personal, wherever situated, *acquired by a married person during the marriage while domiciled in this state is community property*." (Italics added.) "Family Code section 760 creates '"a general presumption that property acquired during marriage by either spouse other than by gift or inheritance is community property *unless traceable to a separate property source*."'" (*In re Marriage of Finby* (2013) 222 Cal.App.4th 977 983-984, italics added.)

6

Thus, we begin with the presumption that Observatory, which was acquired during the parties' marriage, is a community asset. The burden was on Larry to demonstrate that the acquisition of Observatory was traceable to his separate property. "A spouse's claim that property acquired during a marriage is separate property must be proven by a preponderance of the evidence." (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1400 (*Valli*).)

### b. The HELOC was presumptively community property and Larry failed to rebut the presumption

Larry contends that Observatory is his separate property because the funds used to purchase it were obtained from the HELOC taken out against Pavona, which is his separate property. The trial court agreed. In reaching that determination, the trial court acknowledged that "lender intent" was the key to determining whether loan funds qualified as community or separate, but found that (1) "in the absence of direct evidence of [lender] intent regarding a secured loan, the character of the proceeds *is presumed to follow the character of the security given for the loan* . . . and the court may infer lender intent and thus determine the character of the loan by examining the security" (italics added), and (2) "the respective size of the community and separate estates can be persuasive when no direct evidence as to what the lender was relying on for repayment is available." Sylvia contends these findings are inconsistent with the law, and we agree.

The trial court's first conclusion is incorrect because, as stated in *Gudelj v. Gudelj* (1953) 41 Cal.2d 202, 210, "[t]here is a rebuttable presumption that property acquired on credit during marriage *is community property*" and "[i]n the absence of evidence tending to prove that the seller *primarily relied* upon the purchaser's separate property in extending credit, the trial court must find in accordance with the presumption." (Italics added.) In other words, "the character of credit acquisitions during marriage is 'determined according to the intent of the lender to rely upon the separate property of the purchaser or upon a community asset.'" (*In re Marriage of*

*Grinius* (1985) 166 Cal.App.3d 1179, 1186.)[6]  And "[w]ithout satisfactory evidence of the lender's intent, the general presumption prevails."  (*Id.* at p. 1187; see *Ford v. Ford* (1969) 276 Cal.App.2d 9, 14 ["The state of mind of the seller (or, as in this case, the lender) is of course a question of fact"].)

Of course, the fact Pavona was used to secure the HELOC demonstrates the lender relied on that separate property, at least to some extent, in making the loan.  But it does not, in and of itself, demonstrate the lender's *primary* reliance was on that separate property.  Instead, we would presume a lender contemplating the extension of credit is primarily concerned with whether the prospective borrower *can make the loan payments*, not on whether the lender would have sufficient recourse to security in the event of a default.

*Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, is illustrative. There, as in this case, the husband (along with a partner) had purchased a new property – an airport – during his marriage, using a loan secured by his separate property for the down payment.  The court explained that while "[o]rdinarily funds borrowed by hypothecation of a spouse's separate property are also separate property" (*id.* at p. 375), that was not true if the lender had not relied primarily on that hypothecation in extending the credit:  "In the case at bench, however, the court found *that although the Bank took trust deeds on both the airport property and the Alta Loma property, the loans were made 'primarily' on the general credit of Kelber and Latimer.*  The Bank's loan officer testified the additional security on the Alta Loma property was taken only to comply with banking

---

[6]     Larry points out that *In re Marriage of Grinius, supra*, 166 Cal.App.3d at pages 1186-1187, expresses the standard for overcoming the presumption that loan proceeds are community property in stricter terms than were used in *Gudelj v. Gudelj, supra*, 41 Cal.2d at page 210.  Whereas *Gudelj* stated the test was whether the evidence showed the lender "primarily" relied on separate property, *Grinius* expressed it as whether "the lender intended to rely *solely* upon a spouse's separate property."  (*In re Marriage of Grinius, supra*, 166 Cal.App.3d at p. 1187, italics added.)  We are bound to apply the Supreme Court's test.

regulations restricting banks to a loan of up to 60 percent of the appraised value of property given as security." (*Ibid.*, italics added.) And the court noted that "[t]he proceeds of the loan so made on the personal credit of either spouse are regarded as community property." (*Ibid.*)

Larry concedes the latter point, and goes on to acknowledge that "[e]ven if there were no community property" in a given case, it would be virtually impossible for a lender to rely solely on a spouse's separate estate in making a loan because "[a] spouse's skills, efforts, talents and general creditworthiness are community property from the date of marriage to the date of separation." Thus, even in cases where the borrower's existing assets were all separate, Larry admits "the lender would very likely acknowledge that to some minor degree the lender relied on the general character and creditworthiness of the borrower, thereby relying on some community factors." But in this case, we know that in addition to his "general character and creditworthiness," Larry shared in substantial community property income, which as reflected in the parties' 2004 tax return, was $264,715. And while Larry points out "there was absolutely no evidence, presented by either party, that Larry's earnings were considered by [the] lender," that point is of no assistance to him. In this context, the burden *was on Larry* to prove that those earnings, along with his general creditworthiness, were *no*t the primary focus of the lender's decision to extend him credit, in order to overcome the presumption that the loan proceeds were community property. He has not.

In fact, Larry admits there was no "direct evidence" of the lender's intent to rely primarily upon his separate property, rather than community property in extending the HELOC. He claims the dearth of evidence is due to the fact the HELOC "was obtained from Countrywide, a lender which is no longer in existence." But Larry's inability to provide evidence of the lender's intent, whether or not his fault, does not excuse his obligation to do so.

9

And that brings us to the trial court's second challenged conclusion, which is that "the respective size of the community and separate estates can be persuasive when no direct evidence as to what the lender was relying on for repayment is available." Phrased in this conditional way, we cannot say the conclusion is incorrect as a matter of law. What we can say is that it is of little help to Larry here.

Larry contends that the lender must have intended to rely on his *overall* separate property assets in making the loan because those assets were so extensive. Initially, we note this theory is somewhat inconsistent with Larry's (and the trial court's) earlier reliance on Pavona alone as the basis for his separate property claim to the HELOC funds, under the theory that "the character of the proceeds is presumed to follow the character of the security given for the loan." Now his argument seems to be that because his separate wealth was so extensive, the lender must have decided to extend the HELOC primarily on the basis of that separate wealth.

In any event, there are significant problems with this alternative theory as well. First, the record reflects only *Larry's* valuation of those separate assets; there is no evidence of how the lender valued them, or whether they would have met the lender's criteria for issuing the loan. Second, in the absence of corresponding evidence demonstrating the extent of Larry's *community* assets, the extent of Larry's separate property, no matter how great, cannot establish the "*respective size* of the community and separate estate," or offer "persuasive" support for an inference the lender chose to rely on one rather than the other in making the loan. Our record contains no evidence comparing the sizes of those estates, and once again, the dearth of evidence necessarily undermines Larry's position. Absent evidence that the community estate was necessarily *insufficient* to support the Pavona HELOC, we cannot infer the lender must have relied primarily on Larry's separate property in deciding to extend him credit.

Third, none of the separate assets Larry identifies (residential properties, a 401k retirement account, and a vintage Cessna airplane) is liquid, and he makes no

10

showing that they generated sufficient income to meet the repayment obligations of the HELOC. Larry does claim that his residential properties "had considerable positive cash flows." But however true that may be – the record reflects only that Larry testified the properties had "positive cash flows," not that they were "substantial" – it does not establish the lender was actually aware of those claimed cash flows at the time it made the loan, let alone that it relied upon them (as opposed to Larry's substantial community property income) to establish his ability to make required loan payments.

Thus, even if it is true, in the abstract, that "the respective size of the community and separate estates *can be persuasive* when no direct evidence as to what the lender was relying on for repayment is available," Larry made no such showing here.

Larry relies on *Hicks v. Hicks* (1962) 211 Cal.App.2d 144, for the proposition that courts can rely on "circumstantial evidence . . . that the lender relied on separate property in offering the loan." In that case, the court relied on evidence which included "a number of escrow instructions with attendant data." (*Id*. at p. 153.) We have no such evidence here – at best, we have evidence that the lender *could have* primarily relied on Larry's separate property when making the loan, had it chosen to do so. But we have no evidence reflecting that choice was made. Larry also relies on *In re Marriage of Bonvino* (2015) 241 Cal.App.4th 1411, which he characterizes as "practically identical to the facts in the instant appeal." We disagree. In *Bonvino*, the husband used his separate property funds – withdrawn from a Schwab investment account – to make a down payment on a home. The appellate court concluded those funds were not transmuted into community property simply because they were joined with other community funds to purchase the property: "in the absence of a valid transmutation under [Family Code] section 852, the separate and community contributions to the purchase of the Westlake Village [home] maintained their character." (*Id.* at p. 1424.)

In this case, by contrast, Larry did not establish the HELOC funds were his separate property. And although Larry characterizes the HELOC funds as having been

11

taken "from" Pavona, just as the funds in *Bonvino* were taken *from* the husband's investment account, the transactions are in no way equivalent. No funds were actually taken *from* Pavona when Larry obtained the HELOC because no part of that property was sold. Larry still owned it at the time of trial. Instead, what Larry did was simply obtain *a loan of funds*, which, when repaid, would leave his ownership of Pavona entirely intact. And in the absence of evidence the lender actually relied primarily on Larry's separate assets in making that loan – and none was offered here – we are bound by the presumption that the HELOC funds used to purchase Observatory were community property.

> c. *The title presumption cannot be invoked to alter the community character of Observatory*

Sylvia next argues the court erred by invoking the title presumption found in Evidence Code section 662 (section 662) in deciding that Observatory qualified as Larry's separate property. Again, we agree. Section 662 states: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." The trial court expressly concluded that presumption was applicable in this case, and then found that "a corporation grant deed signed by [Larry] on November 16, 2004 and recorded on December 28, 2004, granted the property to Larry R. Klingler, a married man, as his sole and separate property."

We first point out the obvious: a deed's recitation of the manner in which the married purchaser takes title to a property is not particularly probative of whether the property actually qualifies as the purchaser's community or separate property. Neither the seller (presumably an unrelated third party) nor the escrow agent (if any) has any interest in how the purchaser of real property takes title, nor any duty to investigate whether the funds used to purchase the property would be properly characterized as community or separate. Moreover, in a case such as this, where the undisputed evidence

12

showed that Sylvia was not directly involved in the purchase transaction, the deed would not even reflect the acquiescence of the omitted spouse. It merely reflects the decision of the other spouse to take title to the property solely in his or her own name. Consequently, applying the title presumption to a dispute between spouses over whether a property deeded solely to one should be characterized as community or separate would seem to give outsize significance to a piece of evidence which bears little relationship to the manner in which the issue is required to be assessed under the Family Code, and arguably conflicts with Family Code section 760. (See *Valli*, *supra*, 58 Cal.4th at p. 1409 (conc. opn. of Chin, J.) ["'section 662 has no place in the characterization of property in actions between spouses'"].)

But whatever application that title presumption might have in marital cases generally – and our Supreme Court has implied it may have none (*Valli*, *supra*, 58 Cal.4th at p.1406 ["We need not and do not decide here whether Evidence Code section 662's form of title presumption ever applies in marital dissolution proceedings"]), we know it cannot be relied upon to demonstrate that community funds have been *transmuted* into the separate property of one spouse through the purchase of an asset, unless all the requirements for a valid transmutation also exist: "Assuming for the sake of argument that the title presumption may sometimes apply [in marital dissolution proceedings], it does not apply when it conflicts with the transmutation statutes." (*Ibid.*) That is what occurred when the court invoked the title presumption here, and we consequently conclude the trial court erred by doing so.

In *Valli*, husband and wife agreed to purchase a life insurance policy on husband's life and to issue the policy in wife's name. Sometime later, the parties dissolved their marriage, and they disagreed about the characterization of the insurance policy. Husband contended it was community property because it had been purchased with community funds, whereas wife contended it was her separate property because the policy had been issued solely in her name. The court of appeal agreed with wife, relying

13

on the title presumption which it concluded had not been rebutted by clear and convincing evidence. The Supreme Court reversed.

As the high court observed, wife's argument amounted to an assertion that the policy, although purchased with community funds, had been transmuted into her separate property when the parties agreed the insurer would issue it in her name alone. However, the court held that the only way community property can be transformed into the separate property of a spouse is through strict adherence to the requirements of the transmutation statute, Family Code section 852: "Married persons may, through a transfer or an agreement, transmute—that is, change—the character of property from community to separate or from separate to community. [Citation.] A transmutation of property, however, 'is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected.' [Citations.] To satisfy the requirement of an 'express declaration,' a writing signed by the adversely affected spouse *must expressly state that the character or ownership of the property at issue is being changed.*" (*Valli*, *supra*, 58 Cal.4th at p. 1400, italics added.)[7] And because the insurance policy in *Valli* did not meet those requirements, the court determined it could not qualify as a valid transmutation of the community's funds into a separate asset owned by wife alone. In other words, the fact the policy was issued in wife's name only – and thus would presumptively be her sole property by virtue of the title presumption – could not be relied upon in a marital dissolution case as the basis for concluding the policy *belonged* to wife alone.

The same is true here. Just like the insurance policy in *Valli*, Observatory was purchased using community property funds – i.e., the proceeds of the HELOC. And

---

[7]    These requirements do not apply to interspousal gifts of personal items: "This section does not apply to a gift between the spouses of clothing, wearing apparel, jewelry, or other tangible articles of a personal nature that is used solely or principally by the spouse to whom the gift is made and that is not substantial in value taking into account the circumstances of the marriage." (Fam. Code, § 852, subd. (c).)

14

the deed reflecting its new ownership was issued by a third party, naming only one spouse as the sole owner. And just like the *Valli* insurance policy, the Observatory deed does not meet the statutory requirements for a transmutation in that it includes no express declaration that community character or ownership of the property used to purchase Observatory was being changed by virtue of that purchase. Thus, just as in *Valli*, to give that deed binding effect through application of the title presumption would "conflict[] with the transmutation statutes." (*Valli*, *supra*, 58 Cal.4th at p. 1406.) Consequently, it was error for the trial court to do so.

> ### d. The interspousal transfer deed was ineffective to transmute Observatory into Larry's separate property

Sylvia next argues the Interspousal Transfer Grant Deed she signed was presumptively the product of undue influence and Larry offered no evidence to overcome that presumption. As a consequence, the deed was ineffective to transfer her community property interest in Observatory into Larry's separate property. The trial court did not reach this issue, concluding instead that the presumption of undue influence was never triggered because the transaction reflected in the deed was not "unfair" to Sylvia. (*In re Marriage of Burkle* (2006) 139 Cal.App.4th 712, 732 ["in a contractual exchange between spouses, a presumption of undue influence arises only if one of the spouses has obtained an *unfair* advantage over the other"].) That conclusion, in turn, rested on the finding that the community had no equity in Observatory at the time Sylvia signed the Interspousal Transfer Grant Deed, and thus it effectively transferred nothing.

Larry relies upon that same analysis on appeal. He asserts that Sylvia's entire argument is "misplaced" because she "never had an interest in . . . Observatory to transmute." However, as we have otherwise concluded, the majority of Observatory's down payment was made with community funds, rather than Larry's separate property, and consequently this analysis cannot stand. Instead, we conclude that the Interspousal

15

Transfer Grant Deed triggered the presumption of undue influence because it reflects a transmutation of the community's interest in Observatory in exchange for no consideration. Consequently, we remand the case to the trial court with directions to determine whether Larry offered sufficient evidence to overcome that presumption of undue influence.

### e. *Fiduciary duty to purchase Observatory on behalf of the community*

Sylvia also contends Larry breached a fiduciary obligation to "offer" the community the opportunity to purchase Observatory, before purchasing it as his separate property. Sylvia relies on Family Code section 721, which states that "spouses are subject to the general rules governing fiduciary relationships that control the actions of persons occupying confidential relations with each other" and "neither shall take any unfair advantage of the other." (§ 721, subd. (b).) As Sylvia points out, that duty "is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code." (*Ibid.*) And Corporations Code section 16404 includes a duty "[t]o refrain from competing with the partnership in the conduct of the partnership business before the dissolution of the partnership." (Corp. Code, § 16404, subd. (b)(3).)

We conclude this issue is moot in light of our determination that the HELOC used to purchase Observatory was community property. Consequently, whether he intended to or not, Larry did offer the community the opportunity to purchase Observatory. The only issue left to resolve is whether Sylvia's execution of the Interspousal Transfer Grant Deed, which purportedly transmuted the community's interest in Observatory into Larry's separate property, was the product of undue influence.

16

*2. Pavona Mortgage Tracing*

Sylvia next contends the court erred by adopting the conclusion of Larry's forensic accountant, that once Pavona had been rented out, all payments made toward its mortgage were attributable to Larry's separate property income generated by that rental.[8]

As Sylvia points out, the accountant acknowledged there were instances – e.g., if the rent payment for Pavona was late – when the commingled bank account from which the mortgage payments were made held no separate funds on the day a Pavona mortgage payment was disbursed. The accountant explained, however, that he still viewed those mortgage payments as having been made with Larry's separate property based on (1) his view of Larry's intent, and (2) the fact there were *subsequent* deposits of separate property funds sufficient to cover the temporary shortfall. As the accountant stated: "there was no harm to the community if there was a late rent check [because] ultimately they were refunded each and every dollar."

Sylvia argues this tracing analysis is inconsistent with the law, and thus the trial court erred by adopting it. However, what Sylvia does not do is identify which payments she is challenging or their amount, and she makes no attempt to demonstrate how the end result would be different if we agreed with her position.

More significantly, as Larry points out, Sylvia *stipulated* to the total amount of the Pavona mortgage pay down which was attributable to the community, thus agreeing the number calculated by the accountant was correct. The trial court expressly relied upon that stipulation in finding that the community's share of the pay down was 6.71 percent. Having stipulated to that number, Sylvia is bound by it on appeal.

---

[8] Technically, Sylvia's brief claims she is challenging the accountant's "tracing of Larry's separate property payments toward *Observatory*." (Italics added.) However, the accountant's testimony appears to reflect he was analyzing separate property payments toward *Pavona*, rather than Observatory.

17

(*Mooney v. Pickett* (1972) 26 Cal.App.3d 431, 437 ["'A stipulation is conclusive with respect to the matters covered by it, unless the court, for good cause shown, later permits its abandonment or withdrawal'"].)  Consequently, any error has been waived.

*3.  Failure to Include Proceeds of Refinancing in Calculating Moore/Marsden Credits*

Finally, Sylvia argues the trial court erred by failing to credit the community for the refinancing of Pavona and Observatory in calculating *Moore/Marsden* credits.

In support of this argument, Sylvia merely points out that the proceeds of loans taken out during marriage are presumed to be community assets, and then asserts in conclusory terms that Larry failed to offer sufficient evidence to overcome that presumption.  However, on appeal we presume the judgment is correct, and it is Sylvia's burden to demonstrate the evidence was insufficient to support it.  "'[W]hen an appellant urges the insufficiency of the evidence to support the findings it is his duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient.  He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.'"  (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

Sylvia has made no effort to meet that burden with respect to the claimed refinancings; indeed, her opening brief reveals nothing about the Observatory refinance, other than that it occurred in March 2008.  As for the Pavona refinance, Sylvia merely asserts that it happened – and even that assertion is unsupported by any citation to the record.  We conclude the issue is waived.  "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat

18

the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

*4. Valuation Date for Observatory on Remand*

Sylvia's last contention is that, as part of our instructions to the trial court upon remand, we should instruct it to value Observatory as of the present time, rather than as of the date of the original trial. Citing *In re Marriage of Hayden* (1981) 124 Cal.App.3d 72, 78, and *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 761, fn. 17, Sylvia points out that "[u]pon remand, the court has discretion to value assets as of the date of the original trial or as of the date of the retrial." And indeed, *Bergman* says just that: "upon a retrial the court should consider equitable factors in determining whether community property should be valued as of the time of the original trial or the retrial." (*Bergman*, *supra*, 168 Cal.App.3d at p. 761, fn. 17.) What it does not say is that the appellate court should instruct the trial court as to how it should exercise that discretion. Sylvia's argument is for the trial court, not us.

III

DISPOSITION

The judgment is reversed as to the characterization of the Observatory property and the case is remanded to the trial court with directions to assess whether Larry offered sufficient evidence to overcome the presumption of undue influence that attached to the Interspousal Transfer Grant Deed executed by Sylvia in connection with that property. If the court concludes he did not, the Observatory property must be characterized as community property and the affected provisions of the judgment revised

19

accordingly.  The trial court may exercise its discretion, as appropriate, to determine whether equitable factors suggest Observatory should be revalued in connection with this assessment.  In all other respects, the judgment is affirmed.  The parties are to bear their own costs on appeal.


                                    MOORE, ACTING P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.